## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

RECEIVED

2006 MAR 23  A 9: 45

~~DEBRA P. HACKETT, CLK~~
~~U.S. DISTRICT COURT~~
~~MIDDLE DISTRICT ALA~~

| | | |
|---|---|---|
| PERRION ROBERTS, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| WARDEN GLADYS DEESE, DEPUTY | ) | **CIVIL ACTION NO.** |
| WARDEN FRANK ALBRIGHT, | ) | **2:05-CV-1236-MHT** |
| LIEUTENANT LENITA HAWTHORNE, | ) | |
| PRISON HEALTH SERVICES, DR. | ) | |
| SAMUEL ENGLEHARDT, MARION | ) | |
| WRIGHT, R.N. and NURSE MOBLEY, | ) | |
| L.P.N., | ) | |
| | ) | |
| **Defendants.** | ) | |

## SPECIAL REPORT AND ANSWER OF DEFENDANTS
## DR. SAMUEL ENGLEHARDT, MARION WRIGHT, R.N.,
## CATHERINE MOBLEY, L.P.N. AND PRISON HEALTH SERVICES, INC.

COME NOW, Defendants DR. SAMUEL ENGLEHARDT ("Dr. Englehardt"),

MARION WRIGHT, R.N.[1] ("Wright"), CATHERINE MOBLEY, L.P.N. ("Mobley") and

PRISON HEALTH SERVICES, INC. ("PHS," collectively with Dr. Englehardt, Wright and

Mobley, the "Medical Defendants"), pursuant to this Court's Order dated February 1, 2006,

requiring Medical Defendants to provide their written report and Answer, and submit the

following Special Report and Answer addressing the allegations asserted by Plaintiff PERRION

ROBERTS ("Plaintiff"):

---

[1]      On or about March 9, 2006, Medical Defendants submitted a Suggestion of Death to the Court, suggesting
the death of Defendant Marion Wright. Marion Wright died after she left her employment with PHS as the Health
Services Administrator or "HSA" at Tutwiler Prison for Women. (Strickland Affidavit at ¶ 3).

90992.3

## I.    INITIAL DISCLOSURES[2]

Medical Defendants make the following initial disclosures as required by this Court's February 1, 2006, Order for Special Report:

A.    The sworn statement of Dr. Samuel Englehardt;[3]

B.    The sworn statement of Catherine Mobley;[4]

C.    The sworn statement of Dr. Winfred Williams[5]; and

D.    The sworn statement of Laura Strickland with a true and correct copy of Plaintiff's medical records attached thereto.[6]

## II.    NARRATIVE STATEMENT OF FACTS AND CIRCUMSTANCES MATERIAL TO PLAINTIFF'S COMPLAINT[7]

### A.    RHEUMATOID ARTHRITIS

Rheumatoid arthritis is a relatively common condition impacting an individual's joints. (Englehardt Affidavit at ¶ 4).   Rheumatoid arthritis primarily causes inflammation of the synovial membranes or tissue lining the joints. (Id.).   The exact cause of rheumatoid arthritis remains unknown at this time. (Id.). Depending upon the nature of an individual's condition, her

---

[2]    These initial disclosures and the corresponding documents provided herewith are responsive to this Court's requirement to obtain and submit "sworn statements of all persons having knowledge of the subject matter of the complaint" as required by this Court's February 1, 2006, Order for Special Report and Answer. (Order at ¶ 2). The sworn statements attached hereto include any and all present employees of PHS whom the Medical Defendants have identified to the best of their ability as possessing knowledge pertinent and/or material to Plaintiff's allegations in this case.

[3]    A true and correct copy of Dr. Samuel Englehardt's affidavit ("Englehardt Affidavit") is attached hereto as **Exhibit A** and incorporated herein by reference.

[4]    A true and correct copy of Catherine Mobley's affidavit ("Mobley Affidavit") is attached hereto as **Exhibit B** and incorporated herein by reference.

[5]    A true and correct copy of Dr. Winfred Williams's affidavit ("Williams Affidavit") is attached hereto as **Exhibit C** and incorporated herein by reference.

[6]    A true and correct copy of Laura Strickland's affidavit ("Strickland Affidavit") is attached hereto as **Exhibit D** and incorporated herein by reference.   For purposes of this Special Report and Answer, Medical Defendants will cite to and refer to portions of Plaintiff's medical records by Bates-number which begin with the prefix "PHS."

[7]    The Narrative Statement of Facts and Circumstances is derived exclusively from the affidavits and/or documents submitted with this Answer and Special Report.

lifestyle, her physical condition and other contributing factors, the inflammation caused by rheumatoid arthritis can cause significant deterioration of the synovial membranes. (Id.). The primary symptoms of rheumatoid arthritis include pain, stiffness, and swelling in the joints throughout the body. (Id.). Women are twice as likely to suffer rheumatoid arthritis as men and often begin experiencing the symptoms of the condition between the ages of 40 and 60. (Id.).

The medical community has not yet developed a cure for rheumatoid arthritis. (Id.). Current treatment protocols for this disease recognize the condition is a long-term disease that can be controlled *to a degree* by pain and anti-inflammatory medication. (Id.). Medication is prescribed for patients suffering from arthritis in order to reduce pain and is not intended to stop progression of the condition. (Id.). There is no known medical treatment to stop the progression of rheumatoid arthritis. (Id.).

### B.    PLAINTIFF'S ARRIVAL AT JULIA TUTWILER PRISON FOR WOMEN

Plaintiff arrived at Julia Tutwiler Prison for Women ("Tutwiler") in Wetumpka, Alabama, on or about April 21, 2004. (Strickland Affidavit and PHS0007). Plaintiff is currently serving a sentence for possession of a controlled substance. (Strickland Affidavit and PHS0031). Plaintiff was diagnosed with arthritis in 2001, received prescriptions for an "Iron pill," "Celebrex" and "Hydrocodone," and had undergone at least three surgeries, including two surgeries on her left knee and one surgery on her left elbow. (Id.). The "Kitchen Clearance Physical Assessment" Form completed and signed by Plaintiff upon her arrival at Tutwiler specifically referenced that Plaintiff's right arm was in a sling at that time. (Strickland Affidavit and PHS0010).

On April 27, 2004, Plaintiff executed an "Authorization for Release of Information" form. (Strickland Affidavit and PHS0012). As indicated by this Authorization, Plaintiff

authorized PHS to obtain copies of Plaintiff's medical records from The Orthopedic Center in Huntsville, Alabama, which related to treatment received since 2003 for her rheumatoid arthritis. (Id.). The following day, PHS transmitted this form via facsimile to The Orthopedic Center. (Strickland Affidavit and PHS0013). On April 28, 2004, The Orthopedic Center transmitted Plaintiff's medical records to PHS at Tutwiler. (Strickland Affidavit and PHS0014-27).

Plaintiff's medical records from The Orthopedic Center detail the care she received up to approximately one month prior to her incarceration at Tutwiler. (Id.). As of March 4, 2004, Plaintiff's left elbow demonstrated a limited range of motion of approximately 55 degrees, i.e. "only from about 45 degrees to 100 degrees." (Strickland Affidavit and PHS0016). Approximately two weeks later, her range of motion had only improved to approximately 80 degrees. (Strickland Affidavit and PHS0019). Though the physician at The Orthopedic Center prescribed several strong narcotic medications for Plaintiff (see Englehardt Affidavit at ¶ 6; Strickland Affidavit and PHS0014-27), Plaintiff's treatment by this free-world physician included a prescription for "prednisone." (Strickland Affidavit and PHS0025-26). Nothing in the medical records from The Orthopedic Center indicates Plaintiff was ever prescribed any type of physical therapy for her rheumatoid arthritis. (Strickland Affidavit and PHS0014-27).

Within 48 hours of Plaintiff's arrival at Tutwiler, the medical staff began providing her with the antibiotic Flagyl, a muscle relaxer named Baclofen and Tylenol. (Strickland Affidavit and PHS0079, 200). Dr. Englehardt directed Plaintiff to take these medications in differing amounts at 6 a.m. and 6 p.m. every day for periods ranging from ten days to thirty days. (Id.).[8]

---

[8]     During the first month of Plaintiff's incarceration at Tutwiler, Dr. Englehardt ordered that Plaintiff (1) be assigned a lower level bunk, (2) use an arm sling for a period of 90 days, and (3) not engage in any strenuous activity involving "bending, stooping, lifting over 5 pounds, [and/or] push[ing] / pull[ing]" (see Strickland Affidavit and PHS0055-56; Englehardt Affidavit at ¶ 8),

C.    **PROCESSES AND PROCEDURES AT TUTWILER**

1.    **MEDICATION ADMINISTRATION ("PILL CALL") PROCESS**

Upon arriving at Tutwiler, inmates are notified of the procedures and processes for obtaining medical care and prescribed medications. (Strickland Affidavit at ¶ 6). As part of this orientation process, inmates are provided a form entitled "Access to Health Care Services." (Strickland Affidavit at ¶ 6 and PHS004-5). When Plaintiff arrived at Tutwiler, she signed the Access to Care Form included in her medical records. (Id.). As set forth in the Access to Care Form, inmates receive prescribed medication through the process commonly referred to as "pill call." (Id.). Pill call occurs for the general population at Tutwiler (i.e. inmates who are not housed in segregation) every day at 6 a.m. and 6 p.m. (Id.). At these designated times, inmates line up outside of two pill call windows outside of the health care unit. (Strickland Affidavit at ¶ 6). When the inmate arrives at the pill call window, she provides a member of the medical staff who is standing on the other side of the pill call window with her identification badge which is issued by the Alabama Department of Corrections. (Id.). The member of the medical staff then retrieves the inmate's medication which is organized alphabetically and punches the medication out of a medication blister pack into a small plastic cup. (Id.). The medication is provided to the inmate who is required to immediately take the medication. (Id.).

As the pill call process progresses, the medical staff conducting pill call records the disbursement of medication on forms known as "Medication Administration Records" or MARs. (Id.). These MARs are maintained and filed in the individual inmates' medical records. (Id.). Once the medications are dispensed, the medical staff member records the dispensing of medication by placing her initial or initials in the space provided on the corresponding MAR. (Id.). If an inmate does not report to pill call to retrieve her medication, the medical staff

member will either (1) leave the form blank, or (2) place the letter "A" in the space provided, indicating the inmate was "absent." (Id.). If the medical staff conducting pill call discovers an inmate's medication has run out, expired or cannot otherwise be dispensed to the inmate, the medical staff at Tutwiler is instructed to document the unavailability of the medication and notify their supervisor or the prescribing physician immediately. (Id.).

### 2.    KEEP ON PERSON ("KOP") MEDICATION PROGRAM

During Plaintiff's incarceration at Tutwiler, PHS and the Alabama Department of Corrections have maintained a "Keep On Person" or KOP Medication Protocol. (Strickland Affidavit at ¶ 7). Under this protocol, eligible inmates receive medication blister packs containing their medication at one time and are then individually responsible for maintaining the medication, not providing the medication to any other inmates and taking the medications as prescribed. (Id.). Eligible inmates participating in the KOP program are not required to go through the pill call process to obtain their medication. (Id.). The blister packs have designated "reorder rows" which designate when the inmate should notify the medical staff that her medication requires reordering. (Id.). When medication is reordered, the medical staff confirms an inmate's compliance with prescribing physician's orders by checking the remaining blister pack against the inmate's MAR. (Id.).

Inmates are only eligible to receive medication via the KOP process if they have historically demonstrated compliance with their medication or if special circumstances demonstrate it would be medically appropriate for an inmate to forego the pill call process. (Id.). A physician in consultation with the medical staff determines if an inmate is eligible to receive medication via the KOP process. (Id.). Eligibility to participate in the KOP program also depends upon the type of medication being prescribed. (Id.). Before an individual is enrolled in

the KOP program, she is educated about the KOP process by the physician or a member of the medical staff. (Id.). Once an inmate enrolls in the KOP program, she is responsible for notifying the medical staff when her medication requires reordering. (Id.).

### 3.    SICK CALL PROCESS

When an inmate has a non-emergency medical or health problem and/or complaint at Tutwiler, an inmate may file a sick call request form in order to bring this problem or complaint to the attention of the medical staff and/or request medical treatment for this problem. (Strickland Affidavit at ¶ 8). The sick call request process is well-known at Tutwiler and is utilized by inmates on a daily basis. (Id.). In the Access to Health Care Services Form, inmates are provided a complete description of the sick call process. (Strickland Affidavit at ¶ 8 and PHS0004-5). Sick call request forms are available at the Health Care Unit and at various locations throughout the facility. (Id.).

An inmate making a sick call request is required to complete the top portion of the sick call request form (stating her name, the date of request, AIS number, date of birth, dorm location, the nature of the problem or request and her signature). (Id.). The inmate then submits the sick call request form by placing it in one of the many locked boxes located throughout the facility. (Id.). The sick call request forms are removed from the locked box each day at approximately 12:00 p.m., brought to the Health Care Unit and marked as received by the medical records clerk or a nurse at that time. (Id.).

Upon reviewing the sick call request forms, the medical staff compiles a list of inmates that have submitted sick call request forms and provides the list to the Alabama Department of Corrections officer assigned to the Health Care Unit. (Id.). The Health Care Unit officer summons the patients by radio. (Id.). Sick call occurs at 7:30 a.m. (Id.). Inmates who submit

sick call request forms are responsible for reporting to the Health Care Unit for evaluation of their complaints.  (Id.).  The nurse conducting sick call takes inmates' vital signs and either: (1) provides an inmate with medical treatment that can be provided under the nursing protocols, or (2) refers the inmate to the physician or nurse practitioner on staff at Tutwiler.  (Id.).  If an inmate submits more than one (1) sick call request form on the same day, the nurse will only fill in the intake information on one (1) sick call request form regarding the inmate's subjective complaints, objective vital signs, assessment and plan.  (Id.).

A submitted sick call request form that is not completed by PHS's medical staff indicates that an inmate failed to report when summoned to sick call.  (Id.).  If the medical complaints or problems identified by an inmate in a sick call request form appear to be urgent or life-threatening, the medical staff will immediately have the inmate brought to the Health Care Unit for medical treatment, and the inmate will not be required to wait until sick call begins.  (Id.).

### 4.    GRIEVANCE PROCEDURE

PHS has a well-established grievance procedure for any inmate who wishes to voice a complaint regarding any medical treatment she has sought or received during her incarceration at Tutwiler. (Strickland Affidavit at ¶ 9).  The initial orientation process at Tutwiler also includes educating inmates as to the availability of the grievance process.  (Id.).  The existence of Tutwiler's grievance procedure is well-known among the prison population, as indicated by the fact that Strickland, the Health Services Administrator at Tutwiler, receives inmate requests and/or inmate grievances on a daily basis.  (Id.).  PHS's physicians, nurse practitioners, nurses and other medical personnel attempt to resolve all inmate concerns prior to an "inmate grievance" being submitted.  (Id.).  The grievance process is initiated when an inmate submits a Medical Complaint form to the Health Services Administrator through the institutional mail

system. (Id.). This request is reviewed by the Health Services Administrator who provides a written response within five (5) days of receipt of the Medical Complaint. (Id.).

The medical staff's written response to a Medical Complaint is included on the bottom portion of same form containing an inmate's Medical Complaint. (Strickland Affidavit and PHS0249-250). Below the portion of the form designated for the "Response," the following notation appears:

> IF YOU ARE UNSATISFIED WITH THE RESPONSE, YOU MAY FILE A MEDICAL GRIEVANCE USING THE PRISON HEALTH SERVICES GRIEVANCE FORM.

(Id.). As stated in the Medical Complaint forms, the second step of the grievance process involves the submission of a formal Grievance (also referred to as an "appeal"). Written responses to formal Grievances are provided within five (5) days of receipt. (Strickland Affidavit at ¶ 9).

Medical Complaint and Grievance forms are available from the correctional officers at Tutwiler. (Id.). Inmates are instructed to place completed Medical Complaint and Grievance forms in the sick call boxes located throughout the facility. (Id.). When received in the health care unit, Medical Complaint and Grievance forms are sent to Strickland by the medical records clerk or administrative assistant. (Id.). Strickland reviews the grievances daily, provides a written response within five days at the bottom of the form and returns a copy of the completed forms to the inmate. (Id.). Strickland encourages inmates who have complaints about the medical care they have sought or received at Tutwiler to utilize this grievance process. (Id.).

**D.    MEDICAL TREATMENT SOUGHT AND/OR RECEIVED BY PLAINTIFF**

### 1.    PLAINTIFF'S FIRST SIX MONTHS AT TUTWILER

During the first six months of Plaintiff's incarceration, Dr. Englehardt attempted to control the pain associated with Plaintiff's rheumatoid arthritis with various types of medication. (Englehardt Affidavit at ¶ 7). Dr. Englehardt prescribed at least ten different medications for Plaintiff during this period of time specifically for her arthritis and/or to alleviate the side effects of the pain medication. (Strickland Affidavit and PHS0076, 78-79, 88,140-141, 196, 198-200; Englehardt Affidavit at ¶¶ 5, 7). Plaintiff continually expressed dissatisfaction with the medication prescribed by Dr. Englehardt. (Strickland Affidavit and PHS0091-0148).

Between April 28, 2004 and February 1, 2006, Plaintiff submitted 58 sick call request forms, almost *three sick call request forms per month on average*. (Id.). Of these 58 sick call request forms, over half included complaints of some type of joint pain. (Strickland Affidavit and PHS0091, 98, 102, 105, 110, 112, 115, 117, 119. 121, 123-125, 127, 129, 130-136, 140-148). These 58 sick call request forms also included complaints regarding constipation (PHS0092-93), corns on Plaintiff's feet (PHS0094, 99, 101, 118), menstrual problems (PHS0101, 103, 109, 113, 119, 121), an insect bite (PHS0097), mental health problems (PHS0095, 96, 104, 122) as well as other occasional medical problems or complaints (PHS0111, 114, 116, 120, 126, 128, 131, 132, 139). On all but two occasions (see PHS0097, 128). Plaintiff either saw a member of the medical staff or received some written communication from the medical staff in response to questions posed and complaints voiced in the sick call request forms. (Strickland Affidavit and PHS0091-0148). Plaintiff did not see a member of the medical staff on the two occasions evidenced by documents Bates-numbered PHS0097 and 128 because she did not report to the healthcare unit when summoned for sick call. (Strickland Affidavit and PHS0091, 128).

Plaintiff submitted her first sick call request form on May 4, 2004.[9] (Strickland Affidavit and PHS0147). In this sick call request form, Plaintiff requested a "pink slip" also known as a "profile" ordering her to utilize only the bottom bunks, an arm sling, an ace bandage and an extra blanket. (Id.). The medical staff at Tutwiler will occasionally provide inmates at Tutwiler with an order commonly referred to as a "profile." (Englehardt Affidavit at ¶ 8). Inmates often refer to these profiles as "pink slips." (Id.). A profile permits an inmate to deviate from standard practices and procedures at Tutwiler. (Id.). For example, diabetic inmates often receive profiles pertaining to special dietary requirements and inmates with back problems often receive profiles ordering the correctional staff to place the inmates in bottom bunks. (Id.). On May 4 and May 13, 2004, Dr. Englehardt signed profiles ordering that Ms. Roberts be assigned a lower level bunk, use an arm sling for a period of 90 days, and not engage in any strenuous activity involving "bending, stooping, lifting over 5 pounds, and/or pushing / pulling." (Id.).

**Plaintiff did not submit any sick call request form requesting any medication for her arthritic condition until May 29, 2004.** (Strickland Affidavit and PHS0145). Though her May 29, 2004, sick call request form stated "I am in need of Arthritis medician [sic]," she later told a nurse at sick call that "the medication the doctor ordered is not working." (Id.). On the same day Plaintiff submitted this sick call request form, the medical staff at Tutwiler documented providing Plaintiff with 25 milligrams of Indocin at 6 a.m. and 6 p.m. (Strickland Affidavit and PHS0199). Indocin (or "indomethacin") is a type of medication known as a nonsteroidal anti-inflammatory drug or NSAID, which is commonly prescribed to relieve pain, swelling, and joint stiffness caused by or associated with arthritis, gout, bursitis, and tendonitis. (Englehardt

---

[9]      Plaintiff submitted another sick call request form voicing similar complaints on May 6, 2004. (Strickland Affidavit and PHS0146). At that time, she was awaiting an appointment with the physician and she saw Dr. Englehardt on May 13, 2004. (Strickland Affidavit and PHS0089, 146). As a result of this appointment with Dr. Englehardt, he entered two profiles pertaining to special privileges Plaintiff should receive during the designated timeframes. . (Strickland Affidavit and PHS0043-44, 89; Englehardt Affidavit at ¶ 8).

Affidavit at ¶ 5).   One significant side effect of Indocin is gastrointestinal discomfort (Id.).   In order to alleviate this side effect, the medical staff also provided Plaintiff with 150 milligrams of Zantac on May 29, 2004.[10] (Strickland Affidavit and PHS0199; Englehardt Affidavit at ¶ 5). While Zantac may help minimize certain side effects of Indocin, it may not completely eliminate all side effects of the medication. (Englehardt Affidavit at ¶ 5).

Plaintiff submitted a sick call request form on June 8, 2004[11], but did not reference any complaints regarding her medication in the sick call request form. (Strickland Affidavit and PHS0143).   When she attended sick call in the early hours of June 9, 2004, Plaintiff complained that "Tylenol is not helping." (Id.).   On both June 8 and 9, 2004, the medical staff provided Plaintiff with a total of 600 milligrams of Zantac, 100 milligrams of Indocin, 1300 milligrams of Tylenol and 320 milligrams of Mytab. (Strickland Affidavit and PHS0198).   Only days before submitting this June 8, 2004, sick call request form, Plaintiff complained of abdominal pain[12] likely caused by Indocin and, therefore, Dr. Englehardt prescribed her the medication Mytab to help reduce this pain which was likely caused by gas in her digestive tract. (Strickland Affidavit and PHS0078; Englehardt Affidavit at ¶ 9).

Seven days later, Plaintiff requested "a very strong pain medication" in a sick call request form. (Strickland Affidavit and PHS0142).   In this sick call request form, Plaintiff specifically requested to see "*the orthopedic for pain*." (Id.).   The medical staff evaluated Plaintiff the next day (June 16, 2004) and Dr. Englehardt entered an order, prescribing Plaintiff two medications,

---

[10]     Zantac is an H2 histamine blocker which generally reduces the amount of acid in the stomach and is often prescribed to prevent ulcers and alleviate gastrointestinal symptoms such as heartburn and stomach pain. (Englehardt Affidavit at ¶ 5).

[11]     Two days after submitting this sick call request form, Plaintiff received an order from the medical staff permitting her to lay down two hours in the morning and two hours in the afternoon for a period of 180 days. (Strickland Affidavit and PHS0054).

[12]     Plaintiff was specifically instructed on June 2, 2004, that she could limit some abdominal discomfort caused by the Indocin by avoiding "gassy foods." (Strickland Affidavit and PHS0144).   The following day, Dr. Englehardt entered an order for Mytab. (Strickland Affidavit and PHS0078).

10 milligrams of Baclofen twice a day and Percogesic twice a day. (Strickland Affidavit and PHS0078, 198). While Baclofen is a type of muscle relaxer medication, Percogesic is a pain medication often prescribed to help reduce arthritic pain. (Englehardt Affidavit at ¶ 5). Plaintiff received both of these medications on the evening of June 16, 2004, together with other medications prescribed for her at that time and continued to receive this medication throughout the remainder of June, 2004. (Strickland Affidavit and PHS0198).

After receiving this additional medication, Plaintiff complained about the side effects of this medication, i.e. nausea and skin irritation, in a sick call request form dated June 21, 2004, which she described as an "allergic reaction."[13] (Strickland Affidavit and PHS0141). After Plaintiff attended sick call, Dr. Englehardt reviewed her sick call request form dated June 21, 2004, and noted that he would "next" consider altering her medication regime for her arthritis to possibly include other medications such as Sulfasalazine or Plaquenil, both of which are commonly prescribed for rheumatoid arthritis.[14] (Strickland Affidavit and PHS0141; Englehardt Affidavit at ¶¶ 5, 10). Because Dr. Englehardt changed Plaintiff's medication regime only five days before the June 21, 2004, sick call request form, he did not believe it was necessary or advisable to alter her medication regime again, but rather believed it was important to wait and see how Plaintiff responded to the new medication regimen over time. (Englehardt Affidavit at ¶ 10).

On July 7, 2004, Plaintiff submitted a sick call request form complaining of "pain in joints" and requesting "pain meds." (Strickland Affidavit and PHS0140). Plaintiff attended sick

---

[13]     See Section E below entitled "Plaintiff's Alleged Allergies" on page 30.

[14]     Because it was unclear if Plaintiff was truly experiencing an allergic reaction as of June 21, 2004, to the prescribed medication or if the symptoms arose from some other medical condition she was experiencing at that time, Dr. Englehardt elected not to renew Plaintiff's arthritis medication regimen at that time. (Englehardt Affidavit at ¶ 11). Plaintiff did not submit another sick call request form complaining of any adverse reactions to any medication until October 25, 2004. (Strickland Affidavit and PHS0133).

call on July 8, 2004, and was also evaluated by Dr. Englehardt. (Strickland Affidavit and PHS0088, 140). Dr. Englehardt examined Plaintiff and elected to alter her medication regimen again, placing her on tapering dosages of Prednisone over the course of three weeks in hopes of reducing her arthritic pain. (Strickland Affidavit and PHS0078, 88, 140; Englehardt Affidavit at ¶ 12). As indicated in his notes from this appointment, Dr. Englehardt stated he would consider prescribing Methotrexate for Plaintiff which he also noted Plaintiff had never taken previously. (Strickland Affidavit and PHS0088). Methotrexate is an extremely potent medication prescribed for rheumatoid arthritis and some forms of cancer, which can cause severe side effects. (Englehardt Affidavit at ¶ 5). Dr. Englehardt concluded that prescribing Methotrexate for Plaintiff's rheumatoid arthritis would only be considered if the Prednisone regimen did not help limit her pain. (Englehardt Affidavit at ¶ 12).

Between July 8, 2004, and July 29, 2004, Plaintiff received the Prednisone tapering regimen prescribed by Dr. Englehardt. (Strickland Affidavit and PHS0197). On August 6, 2004, Dr. Englehardt evaluated Plaintiff again. (Englehardt Affidavit at ¶ 13; Strickland Affidavit and PHS0076). At that time, Plaintiff reported the Prednisone tapering regimen was not effective and Dr. Englehardt altered her medication regimen again, prescribing her 7.5 milligrams of Methotrexate for her arthritis to be taken once a week for 90 days and 240 milligrams of Surfak for constipation. (Englehardt Affidavit at ¶ 13; Strickland Affidavit and PHS0076, 196). During this same period of time, Plaintiff continued to take other medication prescribed for her arthritis, including Indocin, Percogesic, Tylenol and/or Motrin. (Strickland Affidavit and PHS0196).

In a sick call request form dated August 24, 2004, Plaintiff wrote, "all meds are out. . . new meds not working." (Strickland Affidavit and PHS0138). Though Plaintiff wrote in her sick call request form that her "meds are out" and made the same statement to the nurse during the

August 24 ,2004, sick call (see id.), her MARs indicate that, in the week preceding this sick call request form, Plaintiff received the following medications as prescribed: Methotrexate, Indocin, Percogesic, Flagyl, Zantac and Motrin. (Strickland Affidavit and PHS0196).  Dr. Englehardt notes on the bottom of this sick call request form that Plaintiff "just started Methotrexate." (Strickland Affidavit and PHS0138).  As of August 24, 2004, Dr. Englehardt did not believe it was medically advisable to alter Plaintiff's medication due to the fact he had changed her medication regimen less than three weeks earlier. (Englehardt Affidavit at ¶ 14).

On September 2, 2004, Plaintiff again writes in a sick call request form "meds are out" and requested to see Dr. Englehardt. (Strickland Affidavit and PHS0137).  Again, Plaintiff's MARs indicate she took the following medications on September 2, 2004: Methotrexate, Tylenol, Zantac and Surfak. (Strickland Affidavit and PHS0195).

The medical staff scheduled an appointment for Plaintiff with Dr. Englehardt on September 3, 2004. (Strickland Affidavit and PHS0137).  Following this appointment, Dr. Englehardt again changed Plaintiff's medication regimen in hopes of reducing her discomfort. (Strickland Affidavit and PHS0075, 195).  Specifically, Dr. Englehardt elected to prescribe the Prednisone taper over the course of fifteen days in combination with Naprosyn and Methotrexate. (Id.).  Plaintiff was seen again during sick call on September 24, 2004, after complaining about continued pain and stating "meds are not working." (Strickland Affidavit and PHS0136).  At that time, the medical staff at Tutwiler explained to Plaintiff that she needed to "continue her meds." (Id.).

Only three days before an appointment with Dr. Englehardt, Plaintiff submitted a sick call request form on October 2, 2004, complaining in part about "Med's not working" and continued pain and requesting information regarding her next appointment with Dr. Englehardt.

(Strickland Affidavit and PHS0135). The medical staff evaluated Plaintiff during sick call on October 2, 2004, and notified her of the upcoming appointment with Dr. Englehardt[15]. (Id.).

2. <strong>ORTHOPEDIC CONSULTATION AND SUBSEQUENT TREATMENT</strong>

Dr. Englehardt saw Plaintiff on October 5, 2004. (Strickland Affidavit and PHS0087). After examining Plaintiff, Dr. Englehardt decided to refer Plaintiff to Dr. Pinchback, an orthopedic surgeon, order certain lab work for Plaintiff and increase her Methotrexate prescription from 7.5 milligrams weekly to 10 milligrams weekly for a period of 90 days. (Strickland Affidavit and PHS0075, 87, 191). Dr. Englehardt completed the necessary paperwork to obtain approval to schedule an appointment for Plaintiff with the orthopedic surgeon. (Strickland Affidavit and PHS0223). This "off-site consult" was approved by PHS's Regional Medical Director two days later, and an appointment with the orthopedic surgeon was scheduled for November 10, 2004. (Strickland Affidavit and PHS0218-219, 222).

Between October 5, 2004, and November 10, 2004, Plaintiff submitted four sick call request forms complaining about continued pain and requesting a change in her medications. (Strickland Affidavit and PHS0131-134). Plaintiff requested "stronger pain medication" on October 25, 2004, but complained about the alleged side effects from the Methotrexate on two different occasions over the course of the following ten days. (Strickland Affidavit and PHS0132-134). Throughout this period of time, Dr. Englehardt continued to monitor Plaintiff's complaints by reviewing her sick call request forms, noting on some occasions Plaintiff's pending appointment with an orthopedic surgeon. (Strickland Affidavit and PHS0131-134). During this same period of time, Dr. Englehardt saw Plaintiff on at least one occasion to discuss her complaints about the side effects she was experiencing and continued to alter Plaintiff's

---

[15]    After Plaintiff attended sick call on October 2, 2004, Fran Johnson, a registered nurse at Tutwiler, ordered Plaintiff to use a sling for her right shoulder for a period of 180 days. (Strickland Affidavit and PHS0053).

medication regimen in an attempt to reduce the side effects while treating her arthritic pain. (Strickland Affidavit and PHS0074, 87). On November 2, 2004, Fran Johnson, registered nurse at Tutwiler, ordered Plaintiff to wear a sling for a period of 90 days and to avoid any "strenuous work involving bending, stooping, lifting over 5 pounds or push[ing] / pull[ing]." (Strickland Affidavit and PHS0014-27).

Plaintiff saw Dr. W.L. Pinchback at the Advanced Orthopedic Surgical Specialists, P.C. on November 10, 2004. (Strickland Affidavit and PHS0218-219). According to Dr. Pinchbank's notes, Plaintiff told him Methotrexate "has been making her sick." (Id.). However, his notes also indicate Plaintiff denied any "problems with vision . . . sore throat . . . shortness of breath, . . . chest pain, . . . nausea, vomiting, diarrhea, . . . abdominal pain, . . . heartburn . . . joint or muscle pain, back pain, . . . [or] dizziness" at that time, all of which Plaintiff specifically complained about to PHS within the last two weeks. (Id.). On November 12, 2004, Dr. Pinchback transmitted his evaluation notes to Dr. Englehardt at Tutwiler in which he confirmed Plaintiff was not suffering from any broken bones or bone defects and recommended Plaintiff see a rheumatologist regarding her arthritis. (Strickland Affidavit and PHS0219-221). After confirming with an orthopedic surgeon that Plaintiff was not suffering from any broken bones or bone defects of any kind, Dr. Englehardt decided to continue to treat Plaintiff with pain medication. (Englehardt Affidavit at ¶ 15). As confirmed by subsequent treatment recommended by a rheumatologist, Dr. Englehardt understood a rheumatologist would not prescribe any treatment for Plaintiff other than the same or similar types of pain medication being provided to Plaintiff by the medical staff at Tutwiler. (Id.).

Though Plaintiff occasionally missed pill call and/or failed to report to take her medications during pill call before her appointment with Dr. Pinchback, the frequency of

Plaintiff's absences at pill call increased following her appointment with Dr. Pinchback. (Strickland Affidavit and PHS0191).    For over two months, Plaintiff did not voice any complaints regarding pain or discomfort or submit any sick call request forms requesting any additional or different treatment. (Strickland Affidavit and PHS0130-131).    During this period of time, Plaintiff continued to see Dr. Englehardt and he continued to alter her medication regimen. (Strickland Affidavit and PHS0074, 188).    In late November, 2004, Plaintiff began refusing the Methotrexate prescribed for her by Dr. Englehardt. (Strickland Affidavit and PHS0189).

Dr. Englehardt altered Plaintiff's medication regimen on December 14, 2004, adding to her pain medication regimen 500 milligrams of delayed-release Sulfasalazine (also known as Azulfidine) to be taken daily for ninety days. (Strickland Affidavit and PHS0074, 188; Englehardt Affidavit at ¶ 16).    Delayed-release Sulfasalazine is an anti-inflammatory medication commonly prescribed for patients with arthritis who respond poorly to other pain medications. (Englehardt Affidavit at ¶ 5).    Dr. Englehardt also noted he would recheck Plaintiff after two weeks on this particular medication regimen. (Strickland Affidavit and PHS0074).    After two weeks, Dr. Englehardt examined Plaintiff on December 28, 2004. (Strickland Affidavit and PHS0085; Englehardt Affidavit at ¶ 17).    At that time, Dr. Englehardt was notified for the first time Plaintiff had not received the Sulfasalazine as he prescribed. (Id.).    Upon being notified of this, Dr. Englehardt reordered the Sulfasalazine for Plaintiff and prescribed Percogesic for Plaintiff until the Sulfasalazine arrived at Tutwiler. (Strickland Affidavit and PHS0073, 85, 188). Plaintiff first received Sulfasalazine within one week of this appointment with Dr. Englehardt. (Strickland Affidavit and PHS0187).

### 3. RHEUMATOLOGY CONSULTATION AND SUBSEQUENT TREATMENT

Plaintiff submitted a sick call request form complaining that her medication was "not working" on January 5, 2005. (Strickland Affidavit and PHS0130). Plaintiff was evaluated during sick call and Dr. Englehardt reviewed this sick call request form, noting that she had been on Sulfasalazine "only a few days" and he had elected to "request rheumatology" consult for Plaintiff. (Id.). The following day, Dr. Englehardt completed the necessary paperwork to obtain approval to send Plaintiff to an off-site rheumatologist. (Strickland Affidavit and PHS0217; Englehardt Affidavit at ¶ 18). As indicated by the note "Done 1/7/05" on the Utilization Management Referral Review Form completed by Dr. Englehardt, the medical staff at Tutwiler received approval for this request and scheduled an appointment for Plaintiff with a rheumatologist on or about January 7, 2005. (Id.). However, the first appointment date obtained for Plaintiff was March 8, 2005. (Strickland Affidavit and PHS0213-214).

Between January 6, 2005 and Plaintiff's March 8, 2005, rheumatology appointment, Plaintiff submitted three sick call request forms indicating continued complaints of pain and, on one occasion, dizziness. (Strickland Affidavit and PHS0127-129). During this same period of time, Plaintiff saw Dr. Englehardt on three separate occasions. (Strickland Affidavit and PHS0084-85). Dr. Englehardt continued to adjust Plaintiff's pain medication regimen to provide her with relief. (Strickland Affidavit and PHS0072-73). On January 27, 2005, Dr. Englehardt prescribed a "Medrol Dose Pack," which was intended to reduce any inflammation of Plaintiff's joints, together with Prednisone. (Strickland Affidavit and PHS0073, 187; Englehardt Affidavit at ¶ 19). Following the submission of Plaintiff's February 16, 2005, sick call request form (Strickland Affidavit and PHS0127), Dr. Englehardt prescribed a medication called Plaquenil for Plaintiff, which is another medication utilized to reduce inflammation, swelling, stiffness, and

joint pain associated with arthritis. (Strickland Affidavit and PHS0072, 84, 186; Englehardt Affidavit at ¶ 5). During his March 1, 2005, examination of Plaintiff, Dr. Englehardt noted Plaintiff was taking four different medications for her arthritic condition and she reported feeling "a little better." (Strickland Affidavit and PHS0084).

On March 8, 2005, Plaintiff saw Dr. James T. Jakes at Montgomery Rheumatology Associates in Montgomery, Alabama.[16] (Strickland Affidavit and PHS0083, 213-214). Plaintiff returned from her appointment with Dr. Jakes with PHS's consulting physician form, which included Dr. Jakes's handwritten recommendations regarding medication. (Strickland Affidavit and PHS0216). As Dr. Englehardt wrote on these orders, "I am unable to read this letter . . . written and requested dict[ated] and typed notes." (Id.). On the same day Plaintiff saw Dr. Jakes, Dr. Englehardt entered a separate note in Plaintiff's medical records indicating he saw Plaintiff, could not read the handwritten orders from Dr. Jakes, had requested Dr. Jakes's transcribed notes and recommendations and would see Plaintiff in approximately one week. (Strickland Affidavit and PHS0083). Dr. Englehardt also noted he had personally called Dr. Jakes's office to request his typed notes and recommendations. (Strickland Affidavit and PHS0083). Dr. Englehardt also ordered Plaintiff to lie down for period of 2 hours twice a day, stop working for a period of 90 days and wear "slides" or flip-flop shoes for a period of 90 days. (Strickland Affidavit and PHS0047; Englehardt Affidavit at ¶ 20).

Plaintiff submitted a sick call request form on March 17, 2005, requesting information as to the status of the medication recommended by Dr. Jakes. (Strickland Affidavit and PHS0125). In response to this request, Dr. Englehardt wrote a response to Plaintiff, "I am waiting for

---

[16]    Though Plaintiff writes in her Complaint, "[b]y this time, Plaintifff's right arm had fused in a 90 [degree] angle" (Complaint at p. 10), nothing in Dr. Jakes's notes indicate her right arm was "fused" as of the date of this appointment and, in fact, Dr. Jakes injected Plaintiff's "left elbow with a long-acting steroid preparation." (Strickland Affidavit and PHS0213-214).

rheumatologists' dictated notes." (Id.). Dr. Jakes's notes and his correspondence dated March 8, 2005, were not provided to the medical staff at Tutwiler until March 21, 2005. (Strickland Affidavit and PHS0083, 214; Englehardt Affidavit at ¶ 21). Upon receiving Dr. Jakes's typed notes on March 21, 2005, Dr. Englehardt entered orders in Plaintiff's medical records for her to receive all of the medication recommended by Dr. Jakes, except for the depression medication which could only be ordered and prescribed by DOC's mental health provider.[17] (Strickland Affidavit and PHS0071, 83; Englehardt Affidavit at ¶ 21).

Because Arava is a non-formulary medication not regularly maintained in the Tutwiler pharmacy or prescribed for inmates at Tutwiler, Dr. Englehardt completed a non-formulary pharmacy request form on March 21, 2005, the same day Dr. Jakes's dictated notes were received, requesting approval to purchase this medication for Plaintiff. (Strickland Affidavit and PHS0183). The two other medications recommended by Dr. Jakes, Relafen (an NSAID) and Protonix (an acid reducing medication), had previously been prescribed for Plaintiff by Dr. Englehardt in the form of Indocin and Zantac. (Strickland Affidavit and PHS0071; Englehardt Affidavit at ¶¶ 5, 21). Pursuant to Dr. Jakes's recommendations, Dr. Englehardt continued these medications and discontinued his prior order for Sulfasalazine and Plaquenil. (Strickland Affidavit and PHS0071; Englehardt Affidavit at ¶ 21). On March 21, 2005, Plaintiff began the medication regimen recommended by Dr. Jakes excluding Arava which the medical staff at Tutwiler received and provided to Plaintiff on April 2, 2005. (Strickland Affidavit and PHS0180, 184).

---

[17]    Except for delivering psychotropic medications to inmates during the pill call process conducted by PHS, PHS is not responsible for any mental health care provided to inmates at Tutwiler. (Williams Affidavit at ¶ 4). Psychotropic medications must be prescribed by the mental health care provider at Tutwiler and cannot be prescribed by the PHS physicians at Tutwiler. (Id.). If the medical staff becomes of aware of an actual or potential mental health problem, the medical staff refers inmates to the mental health care provider at Tutwiler. (Id.). The medication Lexapro is a psychotropic medication that may only be prescribed by the mental health care provider at Tutwiler. (Id.).

Plaintiff reported to the health care unit on March 21, 2005, at approximately 8:10 p.m., complaining that "I took to[o] much of that medicine and it made me feel funny." (Strickland Affidavit and PHS0060). According to Plaintiff's medical records, she was seen by Catherine Mobley, a licensed practical nurse at Tutwiler.[18] (Strickland Affidavit and PHS0060; Mobley Affidavit at ¶ 5). During the course of an examination, Plaintiff told Mobley she took "600 milligrams of Motrin [with] 650 milligrams of Tylenol." (Id.). Mobley noted that Plaintiff had existing prescriptions at that time for Tylenol and Motrin. (Id.). Though Plaintiff mentioned she was allergic to "ASA" or acetaminophen, Plaintiff did not mention any other allergies of any kind during her interaction with Mobley. (Id.). After physically examining Plaintiff, Mobley noted Plaintiff was "alert and oriented," did not have any signs of a rash and was capable of walking without any problems. (Id.). Before discharging Plaintiff, Mobley instructed her to "drink a lot of fluids and only take as much meds as needed." (Id.). Mobley did not instruct Plaintiff to drink "fluids" to decrease her pain, but to ensure she did not experience any ill effects from the excessive amounts of Motrin and Tylenol which she acknowledged taking earlier. (Mobley Affidavit at ¶ 5). At the time of her release, Plaintiff was in "satisfactory" condition. (Strickland Affidavit and PHS0060; Mobley Affidavit at ¶ 5). [19] Mobley told Plaintiff to return

---

[18]    Mobley was employed by PHS as a licensed practical nurse at Tutwiler from on or about November 3, 2003 to on or about November 10, 2005. (Mobley Affidavit at ¶ 2).

[19]    Mobley's sole examination of Plaintiff constituted this March 21, 2005, emergency visit by Plaintiff to the health care unit. (Mobley Affidavit at ¶ 4). While Mobley noted that Plaintiff claimed she was allergic to acetaminophen or Tylenol which had been prescribed for her, she was not authorized as a licensed practical nurse to cancel or override in any way Plaintiff's existing prescription for Tylenol. (Mobley Affidavit at ¶ 5). Mobley's ability to treat Plaintiff was limited to examining her, providing her instructions to possibly provide some comfort and send Plaintiff to the local emergency room if she appeared to have any life-threatening condition. (Id.). Plaintiff did not appear to have any life-threatening condition. (Id.). Therefore, Mobley's authority was limited to bringing this matter to the attention of Plaintiff's treating physician by appropriately documenting her interaction with and examination of Plaintiff. (Id.). Dr. Englehardt reviewed Mobley's notes on March 25, 2005, and signed the report indicating his review of the document. (Strickland Affidavit and PHS0060). During the March 21, 2005, visit to the health care unit, Mobley did not ignore any of Plaintiff's complaints or refuse to provide her any type of medical treatment which Mobley was authorized to provide. (Mobley Affidavit at ¶ 6). Mobley did not provide Plaintiff with any medication at any time or refuse to provide Plaintiff with any medication. (Id.). On occasions, Mobley dispensed medication to inmates during pill call at Tutwiler. (Mobley Affidavit at ¶ 3). During pill call, Mobley

to the health care unit if she experienced any additional problems and Plaintiff did not return to the health care unit on that evening or otherwise notify Mobley that she continued to experience any problems. (Mobley Affidavit at ¶ 5).

Two days after this emergency visit to the health care unit, Plaintiff submitted a sick call request form complaining she was "still sick" from the medication recommended by Dr. Jakes and that she had not received "meds from Dr. Jakes or blood work that was ordered." (Strickland Affidavit and PHS0124). Plaintiff was evaluated by the medical staff on March 24, 2005, and referred to Dr. Englehardt. (Id.). In response to Plaintiff's continued complaints of sickness caused by the medication recommended by Dr. Jakes, Dr. Englehardt prescribed Folic Acid for Plaintiff on March 24, 2005, ordered lab work and directed the medical staff to schedule a follow-up appointment for Plaintiff with Dr. Jakes in "4 weeks."[20] (Strickland Affidavit and PHS0071; Englehardt Affidavit at ¶ 22). Dr. Englehardt also formally requested approval for Plaintiff to attend a follow-up appointment with Dr. Jakes. (Strickland Affidavit and PHS0212). As of the date of this sick call request form, Dr. Englehardt had submitted the appropriate documentation to purchase the non-formulary medication Arava, which did not arrive until April 2, 2005. (Strickland Affidavit and PHS0180, 184).

After Plaintiff began receiving all of the medication recommended by Dr. Jakes, her complaints of pain continued. Between April 9, 2005 and July 19, 2005, Plaintiff submitted twelve sick call request forms. (Strickland Affidavit and PHS0112-123). Five of these twelve sick call request forms included complaints of pain, but Plaintiff did not complain in any of these

---

dispensed medication prescribed for the inmates at Tutwiler. (Id.). Mobley was not authorized to alter inmate's medication regimen. (Id.). Mobley did not refuse Ms. Roberts any medication. (Id.). Ms. Roberts did not tell Mobley she was allergic to any medication during pill call. (Id.). If Ms. Roberts had told Mobley during pill call she was allergic to any medication, Mobley would have notified her treating physician. (Id.).

[20]    This request was approved on March 30, 2005. (Strickland Affidavit and PHS0208).

sick call request forms regarding the lack of medication or any adverse effects of the medication. (Id.). The seven remaining sick call request forms contained various complaints which did not relate to Plaintiff's arthritic condition. (Id.). During this same period of time, Plaintiff appeared during pill call and took her medication on a fairly regular basis in comparison to other periods of time during her incarceration at Tutwiler. (Strickland Affidavit and PHS00174-175, 177-180).

On April 8, 2005, Dr. Englehardt prescribed tapering dosages of Prednisone for Plaintiff. (Strickland Affidavit and PHS0071). Orders dated **April 19, 2005**, for Plaintiff indicate on that date Dr. Englehardt ordered Plaintiff to receive a topical anti-itching ointment called Dibucaine, Surfak and Theodur and certain lab work. (Strickland Affidavit and PHS0069; Englehardt Affidavit at ¶ 23).

Plaintiff attended a follow-up appointment with Dr. Jakes on **April 21, 2005**. (Strickland Affidavit and PHS0206). Though Dr. Jakes wrote that Plaintiff "is not taking any other medication for her arthritis" other than Arava (see id.), Plaintiff took Plaquenil, Indocin, Tylenol and Prednisone on the morning of and in the weeks preceding this appointment. (Strickland Affidavit and PHS0180). Dr. Jakes's only recommended change in Plaintiff's medication regimen at that time involved an alteration of the Prednisone dosages and the addition of the medication Flexeril. (Strickland Affidavit and PHS0206, 207). Dr. Jakes's notes did not indicate the period of time over which he recommended Plaintiff receive Flexeril[21]. (Strickland Affidavit and PHS0206). Upon reviewing Dr. Jakes's recommendations, Dr. Englehardt was concerned about the provision of Flexeril to Plaintiff because it appeared Dr. Jakes's recommended Plaintiff receive Flexeril until her follow-up appointment two months later. (Englehardt Affidavit at ¶ 24;

---

[21]    On April 21, 2005, Dr. Englehardt entered orders for Plaintiff reflecting the medications recommended by Dr. Jakes, which included: Prednisone, Arava, Zantac and Flexeril. (Strickland Affidavit and PHS0070, 206). Dr. Englehardt also ordered a follow-up examination in 2 to 3 weeks. (Strickland Affidavit and PHS0070). Plaintiff received a prescription for the birth control medication, Necon, on **May 3, 2005**, as well as 10 milligrams of Flexeril twice daily for seven days. (Strickland Affidavit and PHS0070; Englehardt Affidavit at ¶ 25).

Strickland Affidavit and PHS0204).  Flexeril, a muscle relaxer, should only be prescribed for short term use and the manufacturers of this medication do not recommend prescribing this medication for a period of time greater than three weeks. (Englehardt Affidavit at ¶ 5). Use of Flexeril over an extended period of time can have serious, even potentially fatal, consequences. (Id.)  As matter of caution, Dr. Englehardt customarily limits prescriptions for Flexeril to fourteen days, as he did in Plaintiff's case. (Englehardt Affidavit at ¶ 24).  Dr. Englehardt confirmed on **April 21, 2005**, that Plaintiff was scheduled for a follow-up appointment with Dr. Jakes on **June 23, 2005**, and he ordered certain lab work in anticipation of this appointment. (Strickland Affidavit and PHS0070, 204-205; Englehardt Affidavit at ¶ 24).

Dr. Englehardt changed Plaintiff's medication regimen on **May 12, 2005,** adding 2.5 milligrams of Prednisone to be given once a day for 90 days. (Strickland Affidavit and PHS0069).  Dr. Englehardt also ordered certain lab work for Plaintiff on this date. (Id.).  On May 17 and 24, 2005, Dr. Englehardt signed two profiles for Plaintiff ordering that she (1) be assigned a lower level bunk for 180 days, (2) use an arm sling and ace bandage for 90 days, (3) lie down for period of 2 hours twice a day, (4) stop working for a period of 180 days, (5) receive an extra blanket for a period of 180 days and (5) receive an additional snack twice a day for 180 days.  (Strickland Affidavit and PHS0043-44; Englehardt Affidavit at 26-27).  In response to lab results completed on **May 28, 2005** (see Strickland Affidavit and PHS0237). Dr. Englehardt prescribed Vitamin B12 for Plaintiff for a period of one week to lower Plaintiff's elevated homocysteine levels which is considered an important factor in evaluating the risk of heart disease and can lead to heart attacks. (Strickland Affidavit and PHS0069; Englehardt Affidavit at ¶ 28). On **June 9, 2005**, Dr. Englehardt cancelled Plaintiff's Indocin prescription and prescribed Donnatal to be given to Plaintiff twice daily for 60 days.  (Strickland Affidavit and PHS0069).

Donnatal is a barbiturate utilized for its calming and sedating effects, which can also assist with gastric cramping or other intestinal issues. (Englehardt Affidavit at ¶ 5). Dr. Englehardt renewed Plaintiff's Flexeril prescription on **June 15, 2005**. (Strickland Affidavit and PHS0069).

Plaintiff saw Dr. Jakes again on June 23, 2005. (Strickland Affidavit and PHS0204). Though Plaintiff received Flexeril *on the day of her appointment* (Strickland Affidavit and PHS0175), Dr. Jakes's notes state, "I gave her Flexeril[22], but it was never started." (Id.). Dr. Jakes also noted Plaintiff "doesn't have a lot of treatment options because of her incarceration and her intolerance of oral methotrexate." (Id.). Dr. Jakes referenced several available medications which he did not believe could be administered to Plaintiff in prison. (Id.). Dr. Jakes recommended that the medical staff continue her present medications. (Strickland Affidavit and PHS0204).

On or about June 30, 2005, Dr. Englehardt elected to limit his activities at Tutwiler to his specialty, gynecological and obstetric care, and Dr. Williams assumed responsibility for the management of all general medical care for inmates at Tutwiler, including Plaintiff's arthritic condition. (Englehardt Affidavit at ¶ 29; Williams Affidavit at ¶ 5; Strickland Affidavit and PHS0067-68). Upon taking over responsibility for Plaintiff, Dr. Williams entered orders for medications recommended by Dr. Jakes after his June 23, 2005, appointment with Plaintiff. (Strickland Affidavit and PHS0068).

In mid-July, 2005, Dr. Williams requested and received authorization to transport Plaintiff to a follow-up appointment with Dr. Jakes. (Strickland Affidavit and PHS0176). This appointment was scheduled for September 22, 2005. (Id.). Plaintiff was ordered to the health care unit at Tutwiler on **July 18, 2005**, in order to permit Dr. Williams to discuss her current

---

[22]    The medical staff at Tutwiler administered Flexeril to Plaintiff on the following dates: May 3-4, 2005, May 6-11, 2005, June 22-26, 2005 and June 28-30, 2005. (Strickland Affidavit and PHS0175, 178).

medication regimen with her. (Strickland Affidavit and PHS0068). Dr. Williams directed the medical staff to provide Plaintiff with Percogesic on July 27, 2005. (Strickland Affidavit and PHS0068).

### 4.    SEPTEMBER 19, 2005, SICK CALL REQUEST FORM

Plaintiff submitted a sick call request form on September 19, 2005, claiming she had "been out of [her] medication for almost 60 days" and stating she did not "need prednisone." (Strickland Affidavit and PHS0101).

In the 60 days prior to September 19, 2005, Plaintiff submitted nine sick call request forms. (Strickland Affidavit and PHS0103-111). Plaintiff complained on July 25, 2005, that her "eyes are very irritated and dry [ and] . . . I have a bump on my butt." (Strickland Affidavit and PHS0111). The next day Plaintiff complained of back pain and requested "medicine stronger than Tylonal [sic]." (Strickland Affidavit and PHS0110).

As of September 19, 2005, Plaintiff's MARs reflect that Plaintiff's medication was not "out." (Strickland Affidavit and PHS0163-167). During the month of September, 2005, Plaintiff failed on several occasions to report during pill call to receive her medication. For example, Plaintiff reported to pill at 6 a.m. on September 18, 2005, and received her arthritis medication as prescribed. (Id.). On the evening of September 18, 2005, and the morning of September 19, 2005, Plaintiff did not report to pill call and, therefore, did not receive her medication. (Id.).

Plaintiff's August 7, 2005, sick call request form did not include any complaints regarding pain or the lack of medication. (Strickland Affidavit and PHS0109). On August 9, 2005, Plaintiff saw Dr. Williams and indicated she had not received her medications for a period of ten days. (Strickland Affidavit and PHS0082). After this appointment, Dr. Williams ordered Prednisone, Plaquenil, Arava, Lexapro, Azulfadine, Necon and Flexeril for Plaintiff. (Strickland

Affidavit and PHS0067). During the next week, Plaintiff submitted a sick call request form, stating "I am having an allergic reaction to my meds." (Strickland Affidavit and PHS0108). On August 24, 2005, Plaintiff wrote in her sick call request form, "Have not had arthritis medication (Arava) in five weeks[23]." (Strickland Affidavit and PHS0107). On August 26, 2005, Plaintiff reported to the health care unit and complained that she had not received her medication and had lost range of motion in her right arm. (Strickland Affidavit and PHS0059). Though Plaintiff stated her "my arm is killing me," she did not show any objective signs of pain at that time. (Id.). Plaintiff was referred to the physician following this August 26, 2005, visit. (Id.).

On September 6, 2005, Plaintiff complained that she had not received any medication in "over 30 days." (Strickland Affidavit and PHS0106). Dr. Williams entered an order on September 8, 2005, instructing the medical staff be sure to "get patient meds as ordered on 8/9/05." (Strickland Affidavit and PHS0066). Three days later, Plaintiff submitted to two sick call request forms. (Strickland Affidavit and PHS0104-105). In one of the sick call request forms, Plaintiff wrote, "no medication I am taking is helping . . . ." (Strickland Affidavit and PHS0105). Plaintiff submitted a sick call request form on September 15, 2005, requesting Arava, Lexapro and her birth control medication. (Strickland Affidavit and PHS0103). The following day, Dr. Englehardt ordered the medical staff to provide Plaintiff with a 90-day supply of her birth control medication pursuant to the KOP protocols. (Strickland Affidavit and PHS0066).

Plaintiff attended a follow-up appointment with Dr. Jakes on September 22, 2005. (Strickland Affidavit and PHS0201). Plaintiff returned from this appointment with written recommendations regarding medication including Prednisone, Arava, Azulfidine and Tylenol.

---

[23]    Plaintiff's Medication Administration Records demonstrate she appeared at pill call and received her Arava medication on 15 of 25 days during the month of July, 2005. (Strickland Affidavit and PHS0171).

(Id.).  Dr. Jakes also requested to see Plaintiff again in three months.  (Id.).  After receiving Dr. Jakes's recommendations, Dr. Williams entered orders on **September 26, 2005,** accepting the medication recommendations provided by Dr. Jakes and directed the medical staff to conduct certain lab work. (Strickland Affidavit and PHS0066).

Between **September 23 and October 3, 2005**, Plaintiff submitted three sick call request forms, but did not complain in any of these request forms about not receiving any medication prescribed for her or any pain associated with her arthritis.[24] (Strickland Affidavit and PHS0099-101).  Dr. Williams saw Plaintiff again on **October 10, 2005**. (Strickland Affidavit and PHS0066, 81; Williams Affidavit at ¶ 6).  During this appointment, Plaintiff indicated her pain was "tolerable" and told Dr. Williams "she has received her medications and [was] pleased, but want[ed] them KOP." (Strickland Affidavit and PHS0081; Williams Affidavit at ¶ 6).  At that time, Dr. Williams explained the KOP process to Plaintiff and noted that she seemed to be eligible for the program. (Id.).  Following this appointment, Dr. Williams ordered lab work for Plaintiff and the medication Percogesic, instructed the medical staff to consider enrolling Plaintiff in the KOP program and directed her to return for a follow-up appointment in 2 to 3 weeks. (Id.).

Two days later, on **October 12, 2005**, Plaintiff received her medication to be administered by her via the KOP program at Tutwiler. (Strickland Affidavit and PHS0161-162).  Pursuant to KOP protocol, Plaintiff submitted a sick call request form on **October 25, 2005**, stating her medication needed to be reordered. (Strickland Affidavit and PHS0098),  Plaintiff saw a member of the Tutwiler medical staff on the same day and instructions were given to reorder Plaintiff's medication. (Id.).  This October 25, 2005, sick call request form constitutes the

---

[24]    Plaintiff's September 25, 2005, sick call request form only included a request that she be "called to health care to talk about the medication that I was prescribe . . . [and] to know what health care plain to do about my condition and treatments." (Strickland Affidavit and PHS0100).

last occasion Plaintiff made any complaints regarding pain or informed the medical staff that she did not receive or medication or needed additional medication prior to filing her Complaint. (Strickland Affidavit and PHS0094-98).   On October 26, 2005, Plaintiff's medication was reordered or "renewed." (Strickland Affidavit and PHS0161-162).

Orders entered by Dr. Williams on **October 26, 2005**, reflect that Plaintiff received new orders for the following medications at that time: (1) a prenatal vitamin, (2) Donnatal, (3) Zantac, (4) Folic Acid, (5) Plaquenil, (6) Flexeril, (7) Lexapro, and (8) Arava.  (Strickland Affidavit and PHS0065).  Dr. Englehardt also ordered Plaintiff on **October 31, 2005**, to lie down for 2 hours twice a day, stop working for a period of 180 days and wear "slides" or flip-flop shoes for a period of 180 days. (Strickland Affidavit and PHS0041; Englehardt Affidavit at ¶ 30).

Plaintiff filed her Complaint in this action on December 29, 2005. (See Complaint).

### E.   PLAINTIFF'S ALLEGED ALLERGIES

Plaintiff's statements to medical providers regarding medications to which she is alleged allergic have been historically inconsistent.  When Plaintiff arrived at Tutwiler, she signed the "Inmate Intake Form," warranting the truthfulness of the information provided at that time and she did not indicate any allergies of any kind. (Strickland Affidavit and PHS0007).  Plaintiff appeared in the health care unit at Tutwiler on four different occasions between August of 2004 and August of 2005 and gave three different answers when asked about any allergies. (Strickland Affidavit and PHS0059-62).  On the first occasion Plaintiff saw Dr. Jakes, she mentioned she was "intolerant to Naprosyn because of nausea." (Strickland Affidavit and PHS0214).

Dr. Jakes's records reflect Dr. Englehardt's understanding regarding Plaintiff's understanding of being allergic to medication. (Englehardt Affidavit at ¶ 31).  As Plaintiff told Dr. Jakes, she believes that any adverse reaction to medication automatically translates into the

conclusion that she is "allergic" to that medication.  (Id.).  Plaintiff's prior statements to her

treating physician demonstrate her confusion between an allergy to and a side effect from

medication.[25]  (Id.).  Because of the nature of medication prescribed for rheumatoid arthritis,

most of these medications have significant side effects.  (Id.).  Based upon his experience and the

complaints of pain made by Plaintiff, Dr. Englehardt believed that Plaintiff would rather attempt

to alleviate the side of effects of the medication, which included nausea, rather than continue to

experience the pain she claimed she was experiencing at that time.  (Id.).  Dr. Englehardt made

this judgment based upon his experience with other patients who experienced pain caused by

rheumatoid arthritis and who also complained about the side effects of medication.  (Id.).

F.    PLAINTIFF'S GRIEVANCES

During her incarceration at Tutwiler, Plaintiff filed two grievances. (Strickland Affidavit

at ¶ 10 and PHS0249-250).  Plaintiff submitted her first Medical Complaint on June 1, 2004.

(Strickland Affidavit and PHS0250).  In this Medical Complaint, Plaintiff complained about her

May 29, 2004, sick call visit, when she complained of arthritic pain and stomach pain. (Id.). Like

her Complaint in this action, Plaintiff's Medical Complaint alleges she was told to drink water

for pain during the May 29, 2004, sick call.[26] (Id.).  On June 2, 2004, Marion Wright, the former

Health Services Administrator at Tutwiler, provided the medical staff's response to Plaintiff's

Medical Complaint, stating she had medication ordered for her condition on May 18, 2004.

(Strickland Affidavit at ¶ 3 and PHS0250).  As indicated in Plaintiff's MARs, she was prescribed

the arthritic pain medication, Indocin, and Zantac on May 18, 2004, received this medication

---

[25]    A patient experiences an allergic reaction to medication when her immune system adversely reacts to medication such as the development of a rash.  (Englehardt Affidavit at ¶ 31).  Unlike an allergic reaction, a side effect is the particular condition caused by a particular type of medication.  (Id.).  While nausea is a typical side effect of medication, it is not an indication of an allergic reaction.  (Id.).

[26]    Plaintiff did not see Mobley at the May 29, 2004, sick call, but a registered nurse by the name of K. Griggs. (Strickland Affidavit and PHS00145).

after that date. (Strickland Affidavit and PHS0199). Plaintiff did not submit any appeal indicating her objection to or disagreement with the response provided by Wright. (Strickland Affidavit at ¶ 10 and PHS0249-250).

Plaintiff submitted a second Medical Complaint on April 13, 2005, which Plaintiff described as her "Second Complaint." (Strickland Affidavit and PHS0249). In this Medical Complaint, Plaintiff complained, in large part, about continued pain, limited range of motion in her right arm, the lack of any lab work being done, receiving medication she was "allergic to," and only receiving one (Arava) of the four medications prescribed by Dr. Jakes. (Id.). Plaintiff's MARs indicate she received the following medications for rheumatoid arthritis on the date of this second Medical Complaint: Plaquenil, Indocin, Tylenol, Arava, Prednisone, Folic Acid, Surfak and Theodur. (Strickland Affidavit and PHS0180-181).

Wright provided the medical staff's response to Plaintiff's second Medical Complaint on April 18, 2005. (Strickland Affidavit and PHS0249). In the response, Wright wrote, "[a] follow-up appointment will be made as soon as possible." (Id.). Wright was not authorized to disclose to Plaintiff her appointment three days later with Dr. Jakes due to security protocols imposed by the Alabama Department of Corrections, which prohibits inmates from being informed of the dates and/or times of appointments with off-site medical providers. (Strickland Affidavit at ¶ 11). On April 21, 2005, Plaintiff attended a follow-up appointment with Dr. Jakes. (Strickland Affidavit and PHS0206). Since April 13, 2005, Plaintiff has not filed any additional grievances of any kind or appealed any of the Medical Complaints she filed during her incarceration at Tutwiler. (Strickland Affidavit at ¶ 10 and PHS0249-250).

The provision of responses to these two grievances constitutes the only documented interaction between Wright and Plaintiff. (Strickland Affidavit and PHS0001-0250). Plaintiff's

medical records indicate Wright was not involved in evaluating Plaintiff's complaints at sick call, prescribing medication for Plaintiff, conducting diagnostic tests on Plaintiff, ordering Plaintiff to attend any appointments with any off-site providers or providing medication directly to Plaintiff. (Id.). The only evidence of any complaints communicated to Wright constitutes the two Medical Complaints filed by Plaintiff. (Id.).

## III.    DISCUSSION

Plaintiff's Complaint is based entirely upon her disagreement with the course of treatment prescribed for her and made available to her by the trained, licensed Medical Defendants. (See Complaint). Plaintiff's Complaint does not claim Plaintiff did not receive any treatment for her arthritic condition. Plaintiff's Complaint does not allege any of the Medical Defendants refused to provide her with any necessary medical treatment. Plaintiff simply claims that she was dissatisfied with the specific treatment prescribed for her and the manner in which such treatment was provided. For these reasons and the reasons stated below, Plaintiff's Complaint does not state a claim against the Medical Defendants. Even if Plaintiff's Complaint did state a claim against the Medical Defendants, such claims are precluded by physical injury and exhaustion requirements of the Prison Litigation Reform Act, U.S.C. §1997e.

### A.    THE COMPLAINT FAILS TO STATE ANY CLAIM AGAINST THE MEDICAL DEFENDANTS FOR ANY ALLEGED VIOLATION OF PLAINTIFF'S EIGHTH AMENDMENT RIGHTS.

In the first paragraph of Plaintiff's Complaint, she writes, "[t]his action arises under and is brought pursuant to 42 U.S.C. §1983 to remedy the deprivation . . . of rights guaranteed by the Eig[h]th and Fourteenth Amendments to the United States Constitution." (Complaint at p. 1). By virtue of this language, Plaintiff acknowledges her claims rely exclusively upon the rights

afforded her under the Eighth Amendment. (Id.). The Eighth Amendment[27] does not on its face reference in any way any medical care due to incarcerated persons. See e.g. Marsh v. Butler County, Ala., 268 F. 3d 1014, 1038 (11th Cir. 2001)(en banc). In Estelle v. Gamble, 429 U.S. 97(1976), the United States Supreme Court first inferred a prisoner's "right" to necessary medical care from the text of the Eighth Amendment. In reaching this conclusion, the Estelle Court held that the prohibition against cruel and unusual punishment in the Eighth Amendment prohibits prison officials from acting with "deliberate indifference" with regard to prisoners' serious medical needs. 429 U.S. at 104. Since Estelle, courts have routinely recognized that the Eighth Amendment[28] to the United States Constitution governs the conditions of confinement for prisoners and the treatment of these prisoners during the term of their incarceration. Farmer v. Brennan, 511 U.S. 825, 832 (1994) (quoting Helling v. McKinney, 509 U.S. 25, 31 (1993)); see also Whitley v. Albers, 475 U.S. 312, 327 (1986); Rhodes v. Chapman, 452 U.S. 337, 345-46 (1981).

An alleged claim of "deliberate indifference" under the Eighth Amendment may be actionable under 42 U.S.C. § 1983.[29] See Graham v. Connor, 490 U.S. 386, 393- 94 (1989)(recognizing that § 1983 is not a source of "any substantive right," but rather provides a

---

[27]    The Eighth Amendment applies to the states by virtue of the Fourteenth Amendment's Due Process Clause. Robinson v. California, 370 U.S. 660, 666 (1962).

[28]    Though liability arising out of the treatment of pretrial detainees triggers Fourteenth Amendment considerations, "the minimum standard for providing medical care to a pre-trial detainee under the Fourteenth Amendment is the same as the minimum standard required by the Eighth Amendment for a convicted prisoner . . ." See Hamm v. DeKalb County, 774 F.2d 1567, 1573-74 (11th Cir. 1985). To the extent Medical Defendants rely upon any cases addressing the application of the Fourteenth Amendment in the prison context, such cases are equally applicable in this case.

[29]    42 U.S.C. § 1983 provides, in pertinent part,

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State of Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivations of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceedings for redress . . . .

means for "vindicating federal rights elsewhere conferred."). Every claim by a prisoner that he has not received adequate medical treatment does not state a violation of the Eighth Amendment. McElligott v. Foley, 182 F. 3d 1248, 1254 (11th Cir. 1999). Courts have devoted an extraordinary amount of time clearly defining the requirements for asserting and succeeding upon an Eighth Amendment claim under § 1983. Both the Supreme Court and Eleventh Circuit have described the Eighth Amendment standard of deliberate indifference as requiring allegations and evidence of both "objective" and "subjective" components. See e.g. Farmer, 511 U.S. 825 at 834, 837; Chandler v. Crosby, 379 F. 3d 1278, 1289-90 (11th Cir. 2004).

The "objective" component of the Eighth Amendment analysis requires a prisoner to demonstrate the existence of a condition, act or omission which is sufficiently egregious to violate the Eighth Amendment. See Hudson v. McMillian, 503 U.S. 1, 8 (1992). The underlying conduct or condition must be "extreme" and pose "an unreasonable risk of serious damage to his future health," if left unchecked. Chandler, 379 F. 3d at 1289-90 (quoting Hudson, 503 U.S. at 9) (other citations omitted). At a minimum, a prisoner must allege and establish the existence of "a serious medical need." Chandler, 379 F. 3d at 1289-90; Farrow v. West, 320 F. 3d 1235, 1243 (11th Cir. 2003). The Eleventh Circuit's long-standing definition of "serious medical need" is a condition "that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." See e.g. Farrow, 320 F. 3d at 1243 (citing Hill v. DeKalb Reg'l Youth Det. Ctr., 40 F. 3d 1176, 1187 (11th Cir. 1994) (internal quotations omitted)). Additionally, the serious medical need must be such that, if left untreated, "pos[es] a substantial risk of serious harm." Farmer, 511 U.S. at 834. The burden falls squarely upon Plaintiff to allege and ultimately establish the existence of a serious medical need. See e.g. Hamm v. DeKalb County, 774 F. 2d 1567 (11th Cir. 1985).

If Plaintiff successfully identifies and establishes the existence of a "serious medical need," she must also establish the "subjective" component of an Eighth Amendment violation. Plaintiff must prove the Medical Defendants acted with "deliberate indifference." See e.g. Farmer, 511 U.S. at 837. This subjective component requires evidence the Medical Defendants possessed actual knowledge of "an excessive risk to inmate health or safety" and disregarded that risk. Id. at 837. Evidence demonstrating the Medical Defendants failed "to alleviate a significant risk that [they] should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment" or serve as a basis for a claim of deliberate indifference. Campbell v. Sikes, 169 F. 3d 1353, 1363-1364 (11th Cir. 1999)(other citations omitted); see also Cottrell v. Caldwell, 85 F.3d 1480, 1491 (11th Cir.1996) (holding, "[t]here is no liability for 'an official's failure to alleviate a significant risk that he should have perceived but did not ....'" (quoting Farmer, 511 U.S. at 838)). Courts summarize this component as requiring evidence of a "subjectively sufficiently culpable state of mind." Id. at 1491 (other citations and internal quotations omitted).

It is incumbent upon a prisoner asserting a § 1983 claim to establish "conscious or callous indifference" on the part of the prison official. See e.g. Daniels v. Williams, 474 U.S. 327 (1986); Brown v. Hughes, 894 F.2d 1533, 1537-38 (11th Cir. 1990). For example, a prisoner's § 1983 claim for inadequate medical treatment cannot survive summary judgment unless and until the inmate produces evidence "of the prison official's subjective awareness" of the alleged medical condition and an "intentional refusal [by the official] to provide . . . care." Id.; Campbell v. Sikes, 169 F. 3d 1353, 1364 (11th Cir. 1999) (quoting Steele v. Shah, 87 F. 3d 1266, 1269 (11th Cir. 1996)); Hill, 40 F. 3d at 1186). Without evidence of this "specific intent," a prisoner's § 1983 claim cannot succeed. Steele, 87 F. 3d at 1269.

Courts have devoted a significant amount of time identifying the specific types of allegations which do *not* give rise to the claim of "deliberate indifference." In declaring the "deliberate indifference" standard for the first time, the <u>Estelle</u> Court wrote, "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." 429 U.S. at 106. The Eleventh Circuit in <u>Chandler</u> held a prisoner's discomfort does not give rise to an Eighth Amendment violation. 379 F. 3d at 1295 (citations omitted). Applying <u>Estelle</u>, the Eleventh Circuit also noted that a complaint that prison medical staff should have done more to diagnose and/or treat a prisoner is "at most . . . medical malpractice." <u>Campbell</u>, 169 F. 3d at 1363. Indeed, the Eighth Amendment does not prohibit or provide any remedy for any "accidental inadequacy . . . or even medical malpractice actionable under state law." <u>Taylor v. Adams</u>, 221 F. 3d 1254, 1258 (11th Cir. 2000) (quotations and citation omitted). For this reason, medical decisions not to provide certain types of medical treatment, such as an x-ray, are not actionable as a matter of law under the Eighth Amendment. <u>Id.</u>

The first broad category of cases in which courts have historically mandated limitations upon the liability of prison officials under the Eighth Amendment constitute cases of alleged delayed medical treatment. In cases when a prisoner actually receives medical treatment, courts employ an altered analysis of deliberate indifference. As to claims of delayed medical treatment, the Eleventh Circuit has instructed courts to be hesitant to find an Eighth Amendment violation when officials provide medical care to prison inmates. <u>McElligott</u>, 182 F. 3d at 1259 (11th Cir. 1999) (citing <u>Waldrup v. Evans</u>, 871 F. 2d 1030, 1035 (11th Cir. 1989)). In fact, a prisoner alleging delayed medical treatment must show that the official acted with deliberate indifference, meaning the official knew of the serious medical condition and "intentionally or with reckless

disregarded, delayed treatment." Hinson v. Edmond, 192 F. 3d 1342, 1348 (11th Cir. 1999). In

Hill, the Eleventh Circuit added:

> Cases stating a constitutional claim for immediate or emergency
> medical attention have concerned medical needs that are obvious
> even to a lay person because they involve life-threatening
> conditions or situations where it is apparent that delay would
> detrimentally exacerbate the medical problem. In contrast, *delay
> or even denial of medical treatment for superficial, nonserious
> physical conditions does not constitute an Eighth Amendment
> violation.* * * * Consequently, delay in medical treatment must be
> interpreted in the context of the seriousness of the medical need,
> deciding whether the delay worsened the condition, and
> considering the reason for the delay.

40 F. 3d 1176, 1188-89 (11th Cir. 1994) (emphasis added). Hence, whether a claim arises from

delayed treatment depends upon "the nature of the medical need and the reason for the delay."

Harris v. Coweta County, 21 F. 3d 388, 393-94 (11th Cir. 1994).

Like cases involving claims of delayed medical treatment, courts have applied an altered

analysis of claims involving requests for different or alternative types of medical treatment.

When an inmate claims "different treatment should have been provided," such a claim "is

tantamount to a medical judgment call," not an Eighth Amendment violation. McElligott, 182 F.

3d at 1259. In greater detail, the Eleventh Circuit explained in Hamm:

> Although Hamm may have desired different modes of treatment,
> the care the jail provided did not amount to deliberate indifference.
> See Bass v. Sullivan, 550 F.2d 229, 231-32 (5th Cir.), cert. denied,
> 434 U.S. 864, 98 S.Ct. 195, 54 L.Ed.2d 138 (1977); accord,
> Westlake v. Lucas, 537 F.2d 857, 860 n. 5 (1st Cir. 1981) ("*Where
> a prisoner has received ... medical attention and the dispute is
> over the adequacy of the treatment, federal courts are generally
> reluctant to second guess medical judgments and to
> constitutionalize claims that sound in tort law.*").

774 F. 2d at 1575 (emphasis supplied). Accordingly, in instances where prisoners complain of

delays in medical treatment or request different medical treatment, prisoners must overcome a

much greater threshold in order to state and/or succeed upon such a §1983 claim.

Plaintiff's Complaint is lengthy and includes a myriad of allegations against the individuals who constitute the Medical Defendants in this action. In the final pages of the Complaint, Plaintiff summarizes her claims against Dr. Englehardt, Wright and Mobley as follows:

(1)    Dr. Englehardt allegedly denied Plaintiff the opportunity to see "a specially trained doctor" for a period of "eleven (11) months," failed to provider her with "pain medication and therapy prescribed by her surgeon and specially trained doctor," prescribed her medication "that she is allergic to," and refused her "adequate pain medication." (Complaint at pp. 15-16);

(2)    Wright allegedly "stated to Plaintiff that she must learn to live with pain until she is released . . ." and "refused Plaintiff pain medication." (Complaint at p. 15); and

(3)    Mobley allegedly administered "medication to Plaintiff that she is allergic to and medication that is not Plaintiffs. (Complaint at p. 16).

Though Plaintiff identifies PHS in the introduction to her Complaint as "as private contractor [which] was . . . a Health Service retained by ADOC to provide medical care at Tutwiler" (Complaint at p. 3), Plaintiff's Complaint does not include any specific allegation identifying any alleged act or omission of PHS. As discussed in greater detail below, Plaintiff's Complaint against the Medical Defendants fails to provide any grounds upon which she can state any alleged violation of her constitutional rights by any of the Medical Defendants.

1.    **PLAINTIFF RECEIVED MEDICAL TREATMENT FOR HER RHEUMATOID ARTHRITIS SINCE HER ARRIVAL AT TUTWILER.**

Since Plaintiff arrived at Tutwiler, she has received medical treatment for her rheumatoid arthritis on a regular and frequent basis. As discussed in detail above, Plaintiff received various different types of medications, has been regularly seen by the prison physicians and was referred to medical specialists for evaluation and treatment of her condition. (Strickland Affidavit and

PHS0001-PHS0250).  Though Plaintiff claims she arrived at Tutwiler with prescriptions from her former physician (Complaint at p. 7), nothing in Plaintiff's medical records indicates the medical staff, including the Medical Defendants, ever knew of or ever received any current orders from any physician who saw Plaintiff prior to her incarceration at Tutwiler. (Strickland Affidavit and PHS0001-PHS0250).  Within the first week of her arrival at Tutwiler, Plaintiff saw Dr. Englehardt (Complaint at p. 7), the medical staff received authorization to obtain Plaintiff's medical records from The Orthopedic Center (Strickland Affidavit and PHS0012) and Plaintiff received a prescription for and received three medications for her arthritic condition. (Strickland Affidavit and PHS0079, 200).

Over the course of the next twenty months (between April 2004 and December 2005), Plaintiff received medical attention and medication for her arthritis on a regular basis.  During these twenty months, Plaintiff submitted over fifty sick call request forms. (Strickland Affidavit and PHS0091-0148).  On every occasion she submitted sick call request forms except two (see PHS0097, 128), Plaintiff attended sick call and saw a member of the medical staff. (Strickland Affidavit and PHS0091-0148).  Plaintiff was repeatedly evaluated by the prison physicians and/or outside medical specialists during this period of time and received at least twenty different types of medication for her rheumatoid arthritis during the twenty months prior to the filing of this action. (Strickland Affidavit and PHS0069, 71, 184,186-188, 195-200, 206-207).

Plaintiff's complaints against Dr. Englehardt, Mobley and Wright regarding the inadequacies of medical treatment she received at Tutwiler appear to relate to: (1) the alleged "delay" in sending Plaintiff to a "specially trained doctor," and (2) the alleged inadequacy of the pain medication prescribed for her.  With regard to Plaintiff's claims of delayed referral to a medical specialist, her claims are without merit.  Plaintiff's incarceration at Tutwiler began on or

about April 21, 2004. (Strickland Affidavit and PHS0007).    Between April 21, 2004, and

October 5, 2004, Dr. Englehardt attempted to alleviate Plaintiff's pain through various

medication regimes, which included 10 different types of medications. (Strickland Affidavit and

PHS0076, 78-79,  88,140-141, 196, 198-200; Englehardt Affidavit at ¶ 5, 7).    On October 5,

2004, Dr. Englehardt changed Plaintiff's medication regime again and *referred her to an*

*orthopedic surgeon* for evaluation of her complaints. (Strickland Affidavit and PHS0075, 87,

191).    Plaintiff saw the orthopedic surgeon on November 10, 2004. (Strickland Affidavit and

PHS0218-219).

   Rather than referring Plaintiff to a rheumatologist immediately following Plaintiff's

appointment with the orthopedic surgeon, Dr. Englehardt decided to continue to treat Plaintiff

with pain medication. (Englehardt Affidavit at ¶ 15).    Dr. Englehardt knew a rheumatologist

would not prescribe any treatment for Plaintiff other than the same or similar types of pain

medication being provided to Plaintiff by the medical staff at Tutwiler and, therefore, saw no

immediate reason or medical justification to send Plaintiff to another physician who would likely

continue the same medications being provided to Plaintiff at that time. (Id.).    After Plaintiff

complained of continued pain on January 5, 2005, Dr. Englehardt promptly referred Plaintiff to a

rheumatologist, but Plaintiff did not obtain an appointment with Dr. Jakes until March 8, 2005.

(Strickland Affidavit and PHS0213-214). While Plaintiff waited for her March 8, 2005,

rheumatology appointment, Dr. Englehardt continued to evaluate Plaintiff and alter or adjust her

medication regimen. (Strickland Affidavit and PHS0072-73, 84-85, 127, 186-187).    The only

medication recommended by Dr. Jakes following this first appointment with Plaintiff, which Dr.

Englehardt had not previously prescribed and was authorized to prescribed, constituted the

medication Arava. (Strickland Affidavit and PHS0071, 83; Englehardt Affidavit at ¶ 21).    Dr.

Jakes did not prescribe any physical therapy, surgery or any other type of treatment of any kind other than medication. (Id.).

The process of treating Plaintiff's rheumatoid arthritis clearly constitutes a matter well within Dr. Englehardt's medical judgment. As demonstrated above, Dr. Englehardt continually adjusted Plaintiff's medication and, when medication did not appear to be sufficient, he referred Plaintiff to an orthopedic surgeon. After this referral did not glean any information as to the cause of Plaintiff's problems, Dr. Englehardt then attempted to alleviate Plaintiff's pain through additional changes in medication. When this did not succeed, Plaintiff was referred to a rheumatologist. There is no evidence or any basis for Plaintiff to allege (which she does not) that Dr. Englehardt ever refused to send Plaintiff to any medical specialist. In sum, Plaintiff's allegations amount to her belief she is entitled to a "different mode[ ] of treatment, [which does] not amount to deliberate indifference." Hamm, 74 F. 2d at 1575.

Likewise, Plaintiff's complaints about the specific types of medication she received relate solely to the adequacy of the medication prescribed. Notably, Plaintiff does not claim that Dr. Englehardt, Mobley or Wright ever refused to provide her with *any* medication for her arthritic condition. Plaintiff does not identify any period of time, and her medical records do not indicate any period of time, when Plaintiff was not prescribed or receiving some type of medication for her arthritic pain. Plaintiff cannot identify any specific type of medication which would have completely eliminated her pain. Furthermore, Dr. Englehardt specifically states that medication available to treat rheumatoid arthritis can only control Plaintiff's pain to a degree. (Englehardt Affidavit at ¶ 4). Plaintiff basically claims that the medication she received was not sufficiently effective in her opinion. Again, Plaintiff's opinion or desire for different types of medication are not sufficient to state a claim against Dr. Englehardt.

Plaintiff attempts to assert a claim against Marion Wright[30], a registered nurse or "RN", because she allegedly "refused Plaintiff pain medication." (Complaint at p. 15). Plaintiff is attempting to attach liability to Wright for failing to order or prescribe pain medication for her. In so doing, Plaintiff attempts to hold Wright liable for abiding by the legal restrictions upon the conduct of registered nurses in the State of Alabama. According to Ala. Code § 34-21-86 (1975), "[r]egistered nurses and licensed practical nurses are authorized to administer any legend drug that has been lawfully ordered or prescribed by an authorized practitioner." As defined in Ala. Code § 34-21-81 (1975), a "legend drug" refers to any medication requiring a physician or other practitioner's order. Because Wright could not as a matter of law write prescriptions for inmates at Tutwiler, she cannot be held liable for the alleged failure to prescribe medication for Plaintiff.

> **2.    PLAINTIFF DID NOT EXPERIENCE AN "ALLERGIC REACTION" TO ANY MEDICATION PRESCRIBED FOR HER AT TUTWILER.**

Plaintiff attempts to state a claim against Dr. Englehardt for allegedly prescribing medication to her and against Mobley for allegedly providing her with medication that she was "allergic" to. In approximately March of 2005, Plaintiff claims she experienced an allergic reaction to two medications provided to her by Nurse Mobley and, "[a]t that time, Plaintiff stated that she is allergic to those two medication[s]." (Complaint at p. 13). Plaintiff's definition and understanding of an allergic reaction to medication is problematic. On the first occasion Plaintiff

---

[30]    Plaintiff also attempts to assert a claim against Wright for allegedly telling Plaintiff she "must learn to live with pain until she is released . . . ." (Complaint at p. 15). However, the only documented interaction between Wright and Plaintiff constitute Wright's responses to the two grievances submitted by Plaintiff. (Strickland Affidavit and PHS0001-0250). Plaintiff's medical records indicate Wright was not involved in evaluating Plaintiff's complaints at sick call, prescribing medication for Plaintiff, conducting diagnostic tests on Plaintiff, ordering Plaintiff to attend any appointments with any off-site providers or providing medication directly to Plaintiff. (Id.). In the two responses provided by Wright, she accurately stated the status of Plaintiff's medical treatment at that time. (Strickland Affidavit and PHS0249-250).

saw Dr. Jakes, she mentioned she was "intolerant to Naprosyn because of nausea." (Strickland Affidavit and PHS0214).    As Plaintiff told her rheumatologist, she believes that any adverse reaction to medication automatically translates into the conclusion that she is "allergic" to that medication.    (Id.).    Plaintiff's prior statements to her treating physician demonstrate her confusion between an allergy to and a side effect from medication.    (Id.).    Plaintiff's Complaint does not identify any specific condition that developed as a result of any medication prescribed for her such as a rash.    (See Englehardt Affidavit at ¶ 31).    Because of the nature of medications prescribed for rheumatoid arthritis, most of these medications have significant side effects, which cannot be completely avoided or alleviated.    (Id.).    Dr. Englehardt, with awareness of the side effects of the medications prescribed for Plaintiff, ordered her to receive these medications believing Plaintiff would rather attempt to alleviate her pain and cope with the unavoidable side effects of these medications.    (Id.).    Just as with the decision to treat Plaintiff with medication and alter her medication regimen rather than immediately sending her to a rheumatologist, this decision constituted a decision of medical judgment by Dr. Englehardt.    (Id.).    There is simply no basis for Plaintiff to claim Dr. Englehardt or Mobley violated her constitutional rights by providing her with a medication that made her nauseous or had other non-life threatening side effects.

Additionally, Plaintiff did not clearly and consistently communicate her alleged allergies to the medical providers at Tutwiler.    When Plaintiff arrived at Tutwiler, she signed the "Inmate Intake Form," warranting the truthfulness of the information provided at that time and she did not indicate any allergies of any kind. (Strickland Affidavit and PHS0007).    Plaintiff appeared in the health care unit at Tutwiler on four different occasions between August of 2004 and August of 2005 and gave three different answers when asked about any allergies. (Strickland Affidavit

and PHS0059-62). There is simply no basis for any contention by Plaintiff that any medical provider at Tutwiler knew of her alleged allergies when she remained inconsistent about such allergies during her incarceration.

**3.    THE TREATMENT PROVIDED FOR PLAINTIFF AT TUTWILER DID NOT ADVERSELY EFFECT HER ARTHRITIC CONDITION.**

The only specific allegation in Plaintiff's Complaint regarding the impact of the alleged delayed rheumatology consultation and inadequate pain medication other than continued pain is Plaintiff's allegation that "[b]y this time [the March 8, 2005, rheumatology appointment], Plaintiff's right arm had fused in a 90 [degree] angle" (Complaint at p. 10). This allegation cannot serve as a basis for a claim against any of the Medical Defendants. First, Dr. Jakes did not make any notation in her records of any such fusing of Plaintiff's right arm, but, in fact, injected Plaintiff's "left elbow with a long-acting steroid preparation." (Strickland Affidavit and PHS0213-214). Secondly, her condition was not life-threatening or even potentially fatal. More importantly, there is no evidence Plaintiff's condition was "detrimentally exacerbate[d]," as required by Hill, to state a claim based upon delayed medical treatment. The medical evidence presented by Medical Defendants establishes there is no known medical treatment to stop the progression of rheumatoid arthritis and the medication prescribed for this condition is intended only to reduce pain, not to stop the progression of the condition. (Englehardt Affidavit at ¶ 4). Hence, Plaintiff's Complaint cannot state a claim against any of the Medical Defendants for any alleged delay in medical treatment because there is no basis to conclude that any alleged delay impacted Plaintiff's condition in any way.

4.    PLAINTIFF'S CLAIM AGAINST PHS IS BASED UPON
THE THEORY OF *RESPONDEAT SUPERIOR*.

On the face of Plaintiff's Complaint, it appears Plaintiff names PHS as a defendant in this

action because it is the "private contractor [which] was . . . a Health Service retained by ADOC

to provide medical care at Tutwiler." (Complaint at p. 3). This allegation constitutes the sole

allegation in Plaintiff's Complaint even referencing PHS. Even Plaintiff's summary of claims

against the named Defendants on page 15 and 16 of her Complaint does not reference PHS. Both

the United States Supreme Court and Eleventh Circuit have consistently held, "in section 1983

actions, that liability must be based on something more than a theory of *respondeat superior*."

H.C. by Hewett v. Jarrard, 786 F. 2d 1080, 1086 (11th Cir. 1986) (citing Monell v. Department

of Social Servs., 436 U.S. 658, 691 (1978)). There is no allegation of any causal connection of

any kind between any alleged act or omission of PHS and any constitutional violation alleged by

Plaintiff. Cottone v. Jenne, 326 F. 3d 1352, 1359 (11th Cir. 2003)(citations omitted). Therefore,

Plaintiff fails to identify any basis to state any claim against PHS.

**B.    PLAINTIFF'S COMPLAINT IS BARRED BY THE PRISON LITIGATION
REFORM ACT.**

1.    PLAINTIFF FAILS TO IDENTIFY ANY PHYSICAL
INJURY SUFFERED BY HER.

42 U.S.C. § 1997e(e) provides, "No Federal civil action may be brought by a prisoner

confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered

while in custody without a prior showing of physical injury." The Eleventh Circuit wrote in

Napier v. Preslicka, "This statute is intended to reduce the number of frivolous cases filed by

imprisoned plaintiffs, who have little to lose and excessive amounts of free time with which to

pursue their complaints." 314 F. 3d 528, 532 (11th Cir. 2002)(citing Harris v. Garner, 216 F. 3d

970, 976-979 (11th Cir. 2000)(*en banc*)). When an inmate characterizes his claims for "mental

and emotional injury[,] . . . he [does] not allege physical injury [and] . . . is not entitled to compensatory relief." Boxer X v. Donald, 2006 WL 463243, *2 (11th Cir. 2006)(*slip opinion*); see also Hughes v. Lott, 350 F. 3d 1157, 1159 (11th Cir. 2003)(holding  claims for "mental anguish, humiliation and emotional distress . . . were barred under 42 U.S.C. § 1997e(e)."); Mitchell v. Brown & Williamson Tobacco Corp., 294 F. 3d 1309, 1312-1313 (11th Cir. 2002)(concluding, "a prisoner's claims for emotional or mental injury must be accompanied by allegations of physical injuries that are greater than de minimis." (other citations omitted)). Hence, an inmate's § 1983 claim is barred by § 1997e(e) to the extent her complaint is based upon any mental or emotional injury.

On the signature page of her Complaint, Plaintiff describes the "relief" requested in this matter, writing Plaintiff "prays for judgement [sic] in her favor and money damages in her favor against all defendants in an amount sufficient to compensate her for the pain *and mental anguish* suffered by her due to the deliberate indifference and intentional misconduct of defendants . . . ." (Complaint at p. 14).   Pursuant to § 1997e(e), Plaintiff is not entitled to any judgment or damages arising from any mental anguish.

### 2.    PLAINTIFF FAILED TO EXHAUST HER ADMINISTRATIVE REMEDIES.

42 U.S.C. §1997e(a) of the Prison Litigation Reform Act ("PLRA") mandates that "[n]o action may be brought with respect to prison conditions[31] under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until

---

[31]     The PLRA does not define "prison conditions." See 42 U.S.C. § 1997e.  Nevertheless, 18 U.S.C. §3626(g)(2) defines a "civil action with respect to prison conditions" as any civil action arising under federal law "with respect to the conditions of confinement or the effects of actions by government officials on the lives of persons confined in prison."  The Eleventh Circuit has relied upon this definition of "prison conditions" in applying the PLRA to cases before it. See Higginbottom v. Carter, 223 F. 3d 1259 (11th Cir. 2000).  It is incontrovertible that Plaintiff's allegations in this case relate solely to the "conditions of [her] confinement" at Tutwiler and, as such, trigger the application of the PLRA.

such administrative remedies as are available are exhausted." 42 U.S.C. §1997e(a).[32]   Any

remedy available under § 1983 before this Court is not available unless and until Plaintiff utilizes

the grievance process available within the correctional system.  See e.g. Brown v. Sikes, 212 F.

3d 1205, 1207 (11th Cir. 2000); Miller v. Tanner, 196 F. 3d 1190, 1193 (11th Cir. 1999);

Alexander v. Hawk, 159 F. 3d 1321, 1325 (11th Cir. 1998); see also Higginbottom v. Carter, 223

F. 3d 1259, 1261 (11th Cir. 2000) (holding that invoking the grievance process is "a pre-

condition to filing an action in federal court."); A.N.R. v. Caldwell, 111 F. Supp. 2d 1294, 1297-

99 (M.D. Ala. 2000) (dismissing prisoner's complaint for failure to exhaust administrative

remedies through the available grievance process).   The Supreme Court wrote in Porter v.

Nussle, "exhaustion is now required for all 'action [s] ... brought with respect to prison

conditions,' whether under § 1983 or 'any other Federal law.'" 534 U.S. 516, 524, (2002).

     In Alexander v. Hawk, 159 F. 3d 1321, 1328 (11th Cir. 1998) the Court noted:

> In summary we conclude that Section 1997 e(a) requires
> Alexander to submit his claims for monetary and injunctive relief
> to the [Federal Bureau of Prisons] available prison grievance
> program, even if the relief offered by the program does not appear
> to be "plain, speedy, and effective," before filing those claims in
> federal court.   The judicially created futility and inadequacy
> doctrines do not survive the PLRA's mandatory exhaustion
> requirement.

---

[32]     The PLRA's exhaustion requirement applies to all prisoner suits filed after April 26, 1996. See
Higginbottom v. Carter, 223 F. 3d 1259 (11th Cir. 2000); Alexander v. Hawk, 159 F. 3d 1321 (11th Cir. 1998).  This
requirement was specifically intended to :

> afford[ ] corrections officials time and opportunity to address complaints
> internally before allowing the initiation of a federal case . . . [because i]n some
> instances, corrective action taken in response to an inmate's grievance might
> improve prison administration and satisfy the inmate, thereby obviating the need
> for litigation . . . [and i]n other instances, the internal review might 'filter out
> some frivolous claims.'

Porter v. Nussle, 534 U.S. 516, 524-525 (2002)(citations omitted).

According to the Eleventh Circuit, a prisoner's claims must be dismissed under Rule 12(b)(1) or Rule 12(b)(6) of the <u>Federal Rules of Civil Procedure</u> if he has failed to exhaust his administrative remedies. <u>Chandler</u>, 379 F. 3d at 1286.

Plaintiff did not exhaust her administrative remedies prior to the filing of this action. (Strickland Affidavit at ¶ 10 and PHS0249-250). Plaintiff filed two grievances during her incarceration at Tutwiler. (<u>Id.</u>). In response to both grievances filed by Plaintiff, the medical staff responded with accurate information regarding the present status of Plaintiff's treatment for her rheumatoid arthritis. (<u>Id.</u>; Strickland Affidavit and PHS0180-181, 199, 206). On the Medical Complaint forms utilized by Plaintiff, she was notified that if she was "unsatisfied" with the responses, she was entitled to file a "Medical Grievance" or appeal. (Strickland Affidavit at ¶ 9 and PHS0249-250). Plaintiff never appealed any of the responses provided to her Medical Complaints. (Strickland Affidavit at ¶ 10 and PHS0249-250).

By failing to utilize procedures available to her at Tutwiler, of which she was aware, Plaintiff failed to exhaust the administrative remedies available to her as required by the PLRA. As such, Plaintiff's Complaint is premature.

## VI.   **CONCLUSION**

Based on the foregoing facts and legal arguments, the Complaint filed by Plaintiff Perrion Roberts fails to state a claim against the Medical Defendants.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA RECEIVED
NORTHERN DIVISION

2006 MAR 23  P 4: 27

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA.

| | |
|---|---|
| PERRION ROBERTS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| WARDEN GLADYS DEESE, DEPUTY | ) |
| WARDEN FRANK ALBRIGHT, | ) |
| LIEUTENANT LENITA HAWTHORNE, | ) |
| PRISON HEALTH SERVICES, DR. | ) |
| SAMUEL ENGLEHARDT, MARION | ) |
| WRIGHT, R.N. and NURSE MOBLEY, | ) |
| L.P.N., | ) |
| | ) |
| Defendants. | ) |

CIVIL ACTION NO.
2:05-CV-1236-MHT

## ANSWER OF DEFENDANTS DR. SAMUEL ENGLEHARDT, MARION WRIGHT, R.N., CATHERINE MOBLEY, L.P.N. AND PRISON HEALTH SERVICES, INC.

COME NOW, Defendants DR. SAMUEL ENGLEHARDT ("Dr. Englehardt"), MARION WRIGHT, R.N. ("Wright"), CATHERINE MOBLEY, L.P.N. ("Mobley") and PRISON HEALTH SERVICES, INC. ("PHS," collectively with Dr. Englehardt, Wright and Mobley, the "Medical Defendants"), and for their Answer to the Complaint filed by Plaintiff PERRION ROBERTS ("Plaintiff"), state as follows:

### FACTUAL ALLEGATIONS

1.  To the extent Plaintiff's allegations in section of her Complaint entitled "Jurisdiction and Venue" are intended only for introductory purposes and is not intended to state any claim against the Medical Defendants, no response is required of Medical Defendants. To extent that the section entitled "Jurisdiction and Venue" in Plaintiff's Complaint is intended to state a claim against Medical Defendants, Medical Defendants deny each and every allegation asserted in the section entitled "Jurisdiction and Venue" of Plaintiff's Complaint. Furthermore,

Medical Defendants specifically deny that this Court possesses subject matter jurisdiction over the claims asserted by Plaintiff.

2.    In response to the allegations asserted in the section entitled "Parties" in Plaintiff's Complaint, Medical Defendants provide the following responses:

a.    Medical Defendants admit Plaintiff has been incarcerated at Tutwiler Prison for Women ("Tutwiler") and in the custody of the Alabama Department of Corrections ("ADOC") since April 21, 2004 and remains incarcerated at Tutwiler as of the date of this Answer.

b.    Medical Defendants admit Plaintiff is an adult.

c.    To the extent Plaintiff alleges she is "an adult citizen of the United States and a resident of the State of Alabama," Medical Defendants state they are without knowledge or information sufficient to form a belief as to the truth of these allegations; as such, the same are denied and Medical Defendants demand strict proof thereof.

d.    Medical Defendants admit that Gladys Deese was the Warden of Tutwiler.

e.    Medical Defendants deny that Gladys Deese is currently the Warden of Tutwiler.

f.    Medical Defendants admit that Frank Albright was the Deputy Warden of Tutwiler.

g.    Medical Defendants deny that Frank Albright is currently the Deputy Warden of Tutwiler.

h.    Medical Defendants state they are without knowledge or information sufficient to form a belief as to the truth of any allegations regarding "Lenita Hawthorne"; as such, the same are denied and Medical Defendants demand strict proof thereof.

i.      Medical Defendants admit PHS is the private health care provider contracted by ADOC to provide medical services to the inmates confined at Tutwiler.

j.      Medical Defendants admit Englehardt is a physician employed by PHS at Tutwiler.

k.      Medical Defendants admit Mobley is a licensed practical nurse formerly employed by PHS at Tutwiler.

l.      Medical Defendants admit Wright was  a registered nurse formerly employed by PHS at Tutwiler.

m.      Except as expressly admitted or denied in subparagraphs a. through l. above, Medical Defendants deny each and every remaining allegation in the section of Plaintiff's Complaint entitled "Parties" and demands strict proof thereof.

3.      In response to the allegations contained in the section entitled "Previous Lawsuits" in Plaintiff's Complaint, Medical Defendants admit Plaintiff previously filed a lawsuit against the former ADOC Commissioner Donal Campbell in the United States District Court for the Middle District of Alabama, 2:05-cv-578-F, which is pending as of the date of this Answer. Except as expressly admitted herein above, Medical Defendants state they are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in the section entitled "Previous Lawsuits" in Plaintiff's Complaint; as such, the same are denied and Medical Defendants demand strict proof thereof.

4.      In response to the allegations asserted in the sections entitled "Place of Confinement" and "Place of Institution where Incident Occurred," Medical Defendants admit Plaintiff's Complaint arises out of her incarceration at Tutwiler where she is currently incarcerated.  Except as expressly admitted, Medical Defendants deny each and every remaining

allegation in the sections entitled "Place of Confinement" and "Place of Institution where Incident Occurred," and demand strict proof thereof.

5.    Medical Defendants deny the allegations in the section entitled "The Date Upon Which Said Violation Occurred," and demand strict proof thereof.

6.    Medical Defendants deny the allegations in the section entitled "State briefly the grounds on which you base your allegation that your constitutional rights are being violated" and demands strict proof thereof.

7.    Medical Defendants deny the allegations set forth in the section entitled "Statement of Claim" and demand strict proof thereof.

8.    In response to the section entitled "Statement of Facts" and paragraphs numbered 1 through 24 in Plaintiff's Complaint, Medical Defendants state as follows:

    a.    In response to the allegations in paragraph 1 of the "Statement of Facts" in Plaintiff's Complaint, Medical Defendants admit Plaintiff was incarcerated in Tutwiler in April of 2004.  Except as expressly admitted above, Medical Defendants deny the remaining allegations in paragraph 1 of the "Statement of Facts" in Plaintiff's Complaint.

    b.    In response to the allegations in paragraph 2 of the "Statement of Facts" in Plaintiff's Complaint, Medical Defendants admit Plaintiff was diagnosed with rheumatoid arthritis prior to her incarceration at Tutwiler and her medical records indicate at least three surgeries pre-dating her incarceration at Tutwiler.  Except as expressly admitted above, Medical Defendants deny the remaining allegations in paragraph 2 of the "Statement of Facts" in Plaintiff's Complaint.

    c.    In response to the allegations in paragraph 3 of the "Statement of Facts" in Plaintiff's Complaint, Medical Defendants admit Plaintiff saw Dr. Englehardt on April 21, 2004.

Except as expressly admitted above, Medical Defendants deny the remaining allegations in paragraph 3 of the "Statement of Facts" in Plaintiff's Complaint.

        d.      In response to the allegations in paragraph 4 of the "Statement of Facts" in Plaintiff's Complaint, Medical Defendants state they are without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 4 of the "Statement of Facts" in Plaintiff's Complaint; as such, the same are denied and Medical Defendants demand strict proof thereof.

        e.      In response to the allegations in paragraph 5 of the "Statement of Facts" in Plaintiff's Complaint, Medical Defendants admit Plaintiff submitted two Medical Complaints which were submitted to Wright. Except as expressly admitted above, Medical Defendants deny the remaining allegations in paragraph 5 of the "Statement of Facts" in Plaintiff's Complaint.

        f.      Medical Defendants deny the allegations in paragraphs 6, 7 and 8 of the "Statement of Facts" in Plaintiff's Complaint and demand strict proof thereof.

        g.      In response to the allegations in paragraph 9 of the "Statement of Facts" in Plaintiff's Complaint, Medical Defendants state they are without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 4 of the "Statement of Facts" in Plaintiff's Complaint; as such, the same are denied and Medical Defendants demand strict proof thereof.

        h.      In response to the allegations in paragraph 10 of the "Statement of Facts" in Plaintiff's Complaint, Medical Defendants admit Plaintiff saw an orthopedic surgeon in 2004 who referred her to a rheumatologist. Except as expressly admitted above, Medical Defendants deny the remaining allegations in paragraph 10 of the "Statement of Facts" in Plaintiff's Complaint.

i.      In response to the allegations in paragraph 11 of the "Statement of Facts" in Plaintiff's Complaint, Medical Defendants state they are without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 11 of the "Statement of Facts" in Plaintiff's Complaint; as such, the same are denied and Medical Defendants demand strict proof thereof.

j.      Medical Defendants deny the allegations in paragraph 12 of the "Statement of Facts" in Plaintiff's Complaint and demand strict proof thereof.

k.      In response to the allegations in paragraph 13 of the "Statement of Facts" in Plaintiff's Complaint, Medical Defendants state they are without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 13 of the "Statement of Facts" in Plaintiff's Complaint; as such, the same are denied and Medical Defendants demand strict proof thereof.

l.      In response to the allegations in paragraph 14 of the "Statement of Facts" in Plaintiff's Complaint, Medical Defendants admit Plaintiff saw Dr. Jakes, an outside rheumatologist on or about March 8, 2005, and he recommended that Plaintiff receive four different types of medication and certain lab work be conducted.  Except as expressly admitted above, Medical Defendants deny the remaining allegations in paragraph 14 of the "Statement of Facts" in Plaintiff's Complaint.

m.      Medical Defendants deny the allegations in paragraphs 15, 16 and 17 of the "Statement of Facts" in Plaintiff's Complaint and demand strict proof thereof.

n.      In response to the allegations in paragraph 18 of the "Statement of Facts" in Plaintiff's Complaint, Medical Defendants admit Plaintiff saw Dr. Jakes, an outside rheumatologist on or about June 23, 2005, and he recommended that Plaintiff receive certain

types of medication.   Except as expressly admitted above, Medical Defendants deny the remaining allegations in paragraph 18 of the "Statement of Facts" in Plaintiff's Complaint.

o.    Medical Defendants deny the allegations in paragraph 19 of the "Statement of Facts" in Plaintiff's Complaint and demand strict proof thereof.

p.    In response to the allegations in paragraph 20 of the "Statement of Facts" in Plaintiff's Complaint, Medical Defendants admit Plaintiff has submitted sick call request forms and Medical Complaint forms during her incarceration at Tutwiler.   Except as expressly admitted above, Medical Defendants deny the remaining allegations in paragraph 20 of the "Statement of Facts" in Plaintiff's Complaint.

q.    Medical Defendants deny the allegations in paragraph 21 of the "Statement of Facts" in Plaintiff's Complaint and demand strict proof thereof.

r.    In response to the allegations in paragraph 22 of the "Statement of Facts" in Plaintiff's Complaint, Medical Defendants admit Plaintiff attended a follow-up appointment with Dr. Jakes on or about September 22, 2005.   Except as expressly admitted above, Medical Defendants deny the remaining allegations in paragraph 22 of the "Statement of Facts" in Plaintiff's Complaint.

s.    Medical Defendants deny the allegations in paragraph 23 and 24 of the "Statement of Facts" in Plaintiff's Complaint and demand strict proof thereof.

9.    Medical Defendants deny Plaintiff is entitled to any relief enumerated in the section entitled "Prayer for Relief" in her Complaint.

10.    Unless otherwise admitted hereinabove, Medical Defendants deny each and every allegation asserted by Plaintiff in her Complaint and demand strict proof thereof.

11.    In response to the two pages of allegations following Plaintiff's signature in her Complaint, Medical Defendants deny these allegations and demand strict proof thereof.

## AFFIRMATIVE AND OTHER DEFENSES

### First Defense

Plaintiff's Complaint fails to state a claim upon which relief can be granted.

### Second Defense

Plaintiff's claims are barred by the doctrine of contributory negligence and/or last clear chance.

### Third Defense

Plaintiff's claims are barred by the doctrine of assumption of risk.

### Fourth Defense

Plaintiff's claims are barred by the doctrine of laches.

### Fifth Defense

Plaintiff's claims are barred by the statute of limitations.

### Sixth Defense

Plaintiff's claims are barred by the doctrine of waiver.

### Seventh Defense

The Court lacks subject matter jurisdiction over this dispute.

### Eighth Defense

This Court is the improper venue in which to assert this action.

### Ninth Defense

Plaintiff lacks standing to bring this action.

### Tenth Defense

Plaintiff's claims are barred by the doctrine of unclean hands.

### Eleventh Defense

Plaintiff's claims are barred by the doctrine of qualified immunity.

### Twelfth Defense

Plaintiff's claims are barred by the doctrine of sovereign immunity.

### Thirteenth Defense

Plaintiff's claims are barred by the doctrine of estoppel.

### Fourteenth Defense

Plaintiff's claims are barred by the doctrine of *res judicata* and/or collateral estoppel.

### Fifteenth Defense

Plaintiff's claims are barred, in whole or in part, because of her failure to mitigate damages.

### Sixteenth Defense

Medical Defendants aver that the wrongs and damages alleged by Plaintiff were caused solely by the acts and/or omissions of person and/or entities for whom or which Medical Defendants are not responsible.

### Seventeenth Defense

Plaintiff's claims are barred because Medical Defendants did not breach any duty Defendant allegedly owed to Plaintiff.

### Eighteenth Defense

Plaintiff's claims are barred because there is no casual relationship, legal or proximate, between Medical Defendants' actions or failures to act and the Plaintiff's alleged injuries and damages.

### Nineteenth Defense

Plaintiff's claims are barred because of the existence of superseding, intervening causes.

### Twentieth Defense

Plaintiff's claims are barred because of the lack of damages suffered due to any of the alleged wrongs asserted against Medical Defendants.

### Twenty-First Defense

Plaintiff has failed to exhaust or attempt to exhaust administrative remedies.  42 U.S.C. § 1997e(a) (2005).

### Twenty-Second Defense

Plaintiff's claims are barred because the action asserted is "frivolous, malicious, and fails to state a claim upon which relief can be granted."  42 U.S.C. § 1997e(c)(1) (2005).

### Twenty-Third Defense

Plaintiff's claims are barred because no personal, physical injury has been alleged and/or suffered by Plaintiff.  42 U.S.C. § 1997e(e) (2005).

### Twenty-Fourth Defense

Plaintiff's claims are barred because the injunctive relief sought is not sufficiently narrowly drawn.  18 U.S.C. § 3626(a)(1)(A) (2005).

### Twenty-Fifth Defense

Plaintiff's claims are barred because Medical Defendants did not act with deliberate indifference. Estelle v. Gamble, 429 U.S. 97 (1976).

### Twenty-Sixth Defense

Plaintiff's claims are barred because of his failure to allege the existence of a serious medical condition.

### Twenty-Seventh Defense

Plaintiff's claims are barred because he is seeking to question a medical judgment via injunctive relief.

### Twenty-Eighth Defense

To the extent Plaintiff seeks to recover any attorneys' fees, Medical Defendants object to any and all such requests for fees that are not asserted in the Complaint or otherwise approved by court order.

### Twenty-Ninth Defense

Plaintiff's claims for punitive damages violate PHS's United States and Alabama constitutional protections from, including without limitation, excessive fines, cruel and unusual punishment, denial of due process and denial of equal protection of the law.

### Thirtieth Defense

Medical Defendants reserve the right to assert other defenses as discovery proceeds.

Respectfully submitted on this the 22nd day of March, 2006.

One of the Attorneys for Medical Defendants

**OF COUNSEL:**

David B. Block
William R. Lunsford
BALCH & BINGHAM LLP
Post Office Box 18668
Huntsville, AL 35804-8668
Telephone: (256) 551-0171
Facsimile: (256) 512-0119

90992.3

## CERTIFICATE OF SERVICE

I hereby certify that I filed the foregoing with the Clerk of the Court and service will be perfected by postage prepaid first class mail to the individuals identified below on this the 22th day of March, 2006:

> Perrion Roberts
> AIS# 159116
> Julia Tutwiler Prison for Women
> 8966 U.S. Hwy. 231 North
> Wetumpka, AL 36902

Of Counsel