# EXHIBIT "A"

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| **PERRION ROBERTS,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **WARDEN GLADYS DEESE, DEPUTY** | ) | |
| **WARDEN FRANK ALBRIGHT,** | ) | **CIVIL ACTION NO.** |
| **LIEUTENANT LENITA HAWTHORNE,** | ) | **2:05-CV-1236-MHT** |
| **PRISON HEALTH SERVICES, DR.** | ) | |
| **SAMUEL ENGLEHARDT, MARION** | ) | |
| **WRIGHT, R.N. and NURSE MOBLEY,** | ) | |
| **L.P.N.,** | ) | |
| | ) | |
| Defendants. | ) | |

## AFFIDAVIT OF SAMUEL ENGLEHARDT, M.D.

**STATE OF ALABAMA** )
)
**COUNTY OF MONTGOMERY** )

Before me, the undersigned Notary Public, personally appeared SAMUEL ENGLEHARDT, M.D. who, after being duly sworn, states as follows:

1. My name is Samuel Englehardt, M.D. I am over the age of nineteen (19) years, and I have personal knowledge of the information contained in this affidavit.

2. I am a licensed physician in the state of Alabama. I am currently employed by Prison Health Services, Inc. ("PHS") as a physician at Julia Tutwiler Prison for Women ("Tutwiler").

3. Perrion Roberts ("Roberts") is an inmate currently incarcerated at Tutwiler.

4. Rheumatoid arthritis is a relatively common condition impacting an individual's joints. Rheumatoid arthritis primarily causes inflammation of the synovial membranes or tissue

90963.1

lining the joints. The exact cause of rheumatoid arthritis remains unknown at this time. Depending upon the nature of an individual's condition, her lifestyle, her physical condition and other contributing factors, the inflammation caused by rheumatoid arthritis can cause significant deterioration of the synovial membranes. The primary symptoms of rheumatoid arthritis include pain, stiffness, and swelling in the joints throughout the body. Women are twice as likely to suffer rheumatoid arthritis as men and often begin experiencing the symptoms of the condition between the ages of 40 and 60. The medical community has not yet developed a cure for rheumatoid arthritis. Current treatment protocols for this disease recognize the condition is a long-term disease that can be controlled to a degree by medication. Current treatment protocols for this disease recognize the condition is a long-term disease that can be controlled to a degree by pain and anti-inflammatory medication. Medication is prescribed for patients suffering from arthritis in order to reduce pain and is not intended to stop progression of the condition. There is no known medical treatment to stop the progression of rheumatoid arthritis.

5. Indocin or "indomethacin" is a type of medication known as a nonsteroidal anti-inflammatory drug or NSAID, which is commonly prescribed to relieve pain, swelling, and joint stiffness caused by or associated with arthritis, gout, bursitis, and tendonitis. One significant side effect of Indocin is gastrointestinal discomfort. Zantac may alleviate the gastrointestinal discomfort. Zantac is an H2 histamine blocker which generally reduces the amount of acid in the stomach and is often prescribed to prevent ulcers and alleviate gastrointestinal symptoms such as heartburn and stomach pain. While Zantac may help minimize certain side effects of Indocin, it may not completely eliminate all side effects of the medication. Donnatal is a barbiturate utilized for its calming and sedating effects, which can also assist with gastric cramping or other intestinal issues. Relafen is an NSAID and Protonix is an acid reducing medication. Baclofen is

a type of muscle relaxer medication. Flexeril is a muscle relaxer. Flexeril should only be prescribed for short term use and the manufacturers of this medication do not recommend prescribing this medication for a period of time greater than three weeks. Use of Flexeril over an extended period of time can have serious, even potentially fatal, consequences. Percogesic is a pain medication often prescribed to help reduce arthritic pain. Sulfasalazine and Plaquenil are commonly prescribed for rheumatoid arthritis. Plaquenil is a medication utilized to reduce inflammation, swelling, stiffness, and joint pain associated with arthritis. Delayed-release Sulfasalazine is an anti-inflammatory medication commonly prescribed for patients with arthritis who respond poorly to other pain medications. Methotrexate is an extremely potent medication prescribed for rheumatoid arthritis and some forms of cancer, which can cause severe side effects.

6. Prior to Ms. Roberts's incarceration, a physician at The Orthopedic Center in Huntsville, Alabama prescribed several strong narcotic medications for Ms. Roberts.

7. During the first six months of Ms. Roberts's incarceration, I attempted to control the pain associated with her rheumatoid arthritis with various types of medication. I prescribed at least ten different medications for Ms. Roberts during this period of time specifically for her arthritis and/or to alleviate the side effects of the pain medication.

8. The medical staff at Tutwiler will occasionally provide inmates at Tutwiler with an order commonly referred to as a "profile." Inmates often refer to these profiles as "pink slips." A profile permits an inmate to deviate from standard practices and procedures at Tutwiler. For example, diabetic inmates often receive profiles pertaining to special dietary requirements and inmates with back problems often receive profiles ordering the correctional staff to place the inmates in bottom bunks. On May 4 and May 13, 2004, I signed profiles

90963.1                                      3

ordering that Ms. Roberts be assigned a lower level bunk, use an arm sling for a period of 90 days, and not engage in any strenuous activity involving "bending, stooping, lifting over 5 pounds, and/or pushing / pulling."

9.  On June 1, 2004, Ms. Roberts complained of abdominal pain likely caused by Indocin and, therefore, I prescribed her the medication Mytab to help reduce this pain which was likely caused by gas in her digestive tract.

10.  After Ms. Roberts attended sick call, I reviewed her sick call request form dated June 21, 2004, and noted that I would "next" consider altering her medication regime for her arthritis to possibly include other medications such as Sulfasalazine or Plaquenil. Because I changed Ms. Roberts's medication regime on June 15, 2004, I did not believe it was necessary or advisable to alter her medication regime again, but rather believed it was important to wait and see how she responded to the new medication regimen over time.

11.  Because it was unclear if Ms. Roberts was truly experiencing an allergic reaction as of June 21, 2004, to the prescribed medication or if the symptoms arose from some other medical condition she was experiencing at that time, I elected not to renew Plaintiff's arthritis medication regimen at that time.

12.  On July 8, 2004 I examined Ms. Roberts and elected to alter her medication regimen again, placing her on tapering dosages of Prednisone over the course of three weeks in hopes of reducing her arthritic pain. I concluded that prescribing Methotrexate for Ms. Roberts's rheumatoid arthritis would only be considered if the Prednisone regimen did not help limit her pain.

13.  On August 6, 2004, I evaluated Ms. Roberts again. At that time, Ms. Roberts reported the Prednisone tapering regimen was not effective and I altered her medication regimen

again, prescribing her 7.5 milligrams of Methotrexate for her arthritis to be taken once a week for 90 days and 240 milligrams of Surfak for constipation.

14. As of August 24, 2004, I did not believe it was medically advisable to alter Ms. Roberts' medication due to the fact I had changed her medication regimen less than three weeks earlier.

15. After confirming with an orthopedic surgeon that Ms. Roberts was not suffering from any broken bones or bone defects of any kind, I decided to continue to treat Ms. Roberts with pain medication. As confirmed by subsequent treatment recommended by a rheumatologist, I understood a rheumatologist would not prescribe any treatment for Ms. Roberts other than the same or similar types of pain medication being provided to Ms. Roberts by the medical staff at Tutwiler.

16. I altered Ms. Roberts's medication regimen on December 14, 2004, adding to her pain medication regimen 500 milligrams of delayed-release Sulfasalazine to be taken daily for ninety days.

17. I examined Ms. Roberts on December 28, 2004. At that time, I was notified for the first time Ms. Roberts had not received the Sulfasalazine as I prescribed.

18. On January 6, 2005, I completed the necessary paperwork to obtain approval to send Ms. Roberts to an off-site rheumatologist. As indicated by the note "Done 1/7/05" on the Utilization Management Referral Review Form that I completed, the medical staff at Tutwiler received approval for this request and scheduled an appointment for Ms. Roberts with a rheumatologist on or about January 7, 2005.

19. On January 27, 2005, I prescribed a "Medrol Dose Pack," which was intended to reduce any inflammation of Ms. Roberts's joints, together with Prednisone.

20. On March 8, 2005, I ordered Ms. Roberts to lie down for period of two hours twice a day, stop working for a period of 90 days and wear "slides" or flip-flop shoes for a period of 90 days.

21. Dr. Jakes's notes and his correspondence dated March 8, 2005, were not provided to the medical staff at Tutwiler until March 21, 2005. Upon receiving Dr. Jakes's typed notes on March 21, 2005, I entered orders in Ms. Roberts's medical records for her to receive all of the medication recommended by Dr. Jakes, except for the depression medication which could only be ordered and prescribed by Department of Corrections' mental health provider. A particular side effect of the depression medication prescribed by Dr. Jakes, Lexapro, is joint pain. I had previously prescribed for Ms. Roberts in the form of Indocin and Zantac, the two other medications recommended by Dr. Jakes, Relafen and Protonix. Pursuant to Dr. Jakes's recommendations, I continued these medications and discontinued his prior order for Sulfasalazine and Plaquenil.

22. In response to Ms. Roberts's continued complaints of sickness caused by the medication recommended by Dr. Jakes, I prescribed Folic Acid for Ms. Roberts on March 24, 2005, ordered lab work and directed the medical staff to schedule a follow-up appointment for Ms. Roberts with Dr. Jakes in "4 weeks."

23. On April 19, 2005, I ordered Ms. Roberts to receive a topical anti-itching ointment called Dibucaine, Surfak and Theodur and certain lab work.

24. Upon reviewing Dr. Jakes's recommendations, I was concerned about the provision of Flexeril to Ms. Roberts because it appeared Dr. Jakes recommended Ms. Roberts receive Flexeril until her follow-up appointment two months later. As matter of caution, I customarily limit prescriptions for Flexeril to fourteen days, as I did in Ms. Roberts's case. I

confirmed on April 21, 2005, that Ms. Roberts was scheduled for a follow-up appointment with Dr. Jakes on June 23, 2005, and ordered certain lab work in anticipation of this appointment.

25.   On May 3, 2005, I ordered Ms. Roberts birth control medication, Necon, and 10 milligrams of Flexeril twice daily for seven days.

26.   On May 17, 2005, I signed a profile for Ms. Roberts ordering that she receive an additional snack twice a day for 90 days, stop working for 90 days, lie down for period of 2 hours twice a day for a period of 90 days, wear "slides" for a period of 90 days, and use an arm sling and ace bandage for 90 days.

27.   On May 24, 2005, I signed a profile for Ms. Roberts, ordering her to lie down for period of two hours twice a day, stop working for a period of 180 days, utilize on a "bottom bunk" for a period of 180 days and wear "slides" or flip-flop shoes for a period of 180 days.

28.   On June 1, 2005, I prescribed Vitamin B12 for Ms. Roberts for a period of one week to lower the elevated homocysteine levels reported in her lab results completed on May 28, 2005. Homocysteine level is considered an important factor in evaluating the risk of heart disease and can lead to heart attacks.

29.   On or about June 30, 2005, I elected to limit my activities at Tutwiler to my specialty, gynecological and obstetric care.

30.   On October 31, 2005, I saw Ms. Roberts and ordered her to lie down for 2 hours twice a day, stop working for a period of 180 days and wear "slides" or flip-flop shoes for a period of 180 days.

31.   Dr. Jakes's records reflect my understanding regarding Ms. Roberts's understanding of being allergic to medication. As Ms. Roberts told Dr. Jakes, she believes that any adverse reaction to medication automatically translates into the conclusion that she is

"allergic" to that medication. Ms. Roberts's prior statements to her treating physician demonstrate her confusion between an allergy to and a side effect from medication. A patient experiences an allergic reaction to medication when her immune system adversely reacts to medication such as the development of a rash. Unlike an allergic reaction, a side effect is the particular condition caused by a particular type of medication. While nausea is a typical side effect of medication, it is not an indication of an allergic reaction. Because of the nature of medication prescribed for rheumatoid arthritis, most of these medications have significant side effects. Based upon my experience and the complaints of pain made by Ms. Roberts, I believed that Ms. Roberts would rather attempt to alleviate the side of effects of the medication, which included nausea, rather than continue to experience the pain she claimed she was experiencing at that time. I made this judgment based upon my experience with other patients who experienced pain caused by rheumatoid arthritis and who also complained about the side effects of medication.

32.   I responded in a timely and appropriate manner to Ms. Roberts's written requests for medical treatment. My decisions regarding Ms. Roberts's medical treatment were based on my medical judgment at that time. As with most patients with rheumatoid arthritis, the medical treatment and medications that I prescribed required me to evaluate the benefits of controlling Ms. Roberts's pain through medication against the risks of exposing Ms. Roberts to the unavoidable side effects caused by some of the medications utilized to treat this condition. I did not refuse to provide Ms. Roberts with medical treatment or ignore any of her complaints. When Ms. Roberts notified me that she had not received medical treatment or medication ordered by me, I took steps to ensure that she received treatment and medication.

Further affiant saith not.

_____
Samuel Englehardt, M.D.

**SWORN TO and SUBSCRIBED** before this the 20 day of March, 2006

_____
Notary Public

(SEAL)   My Commission Expires: _____

My Commission Expires 11-19-2006

90963.1                                    9